# United States Court of Appeals
## For the First Circuit

No. 01-1132

SOUTHEX EXHIBITIONS, INC.,

Plaintiff, Appellant,

v.

RHODE ISLAND BUILDERS ASSOCIATION, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Boudin, Chief Judge,

Cyr, Senior Circuit Judge,

and Lynch, Circuit Judge.

Leland P. Schermer, with whom Gregg D. Orsag and Metz, Schermer & Lewis, L.L.C. were on brief for appellant.
Barry J. Kusinitz for appellee.

February 8, 2002

**CYR, <u>Senior Circuit Judge</u>.** Appellant Southex Exhibitions, Inc. ("Southex") challenges a district court bench ruling that no partnership existed between Southex and the Rhode Island Builder's Association, Inc. ("RIBA"), even though Southex's predecessors in interest had produced home shows for RIBA in Rhode Island ever since 1974. We affirm the district court judgment.

## I

## BACKGROUND

In 1974, with the construction of the new Providence Civic Center ("Civic Center") and the expansion in RIBA home shows, RIBA's executive director, Ross Dagata, decided to enter into an agreement with Sherman Exposition Management, Inc. ("SEM"), a Massachusetts-based professional show owner and producer, for future productions of the RIBA home shows at the Civic Center ("the 1974 Agreement"). The preamble in the 1974 Agreement announced that "RIBA wishes to participate in such [s]hows as sponsors and <u>partners</u> . . . ." (Emphasis added.) The term of the 1974 Agreement was fixed at five years, renewable by mutual agreement.

RIBA further agreed (i) to sponsor and endorse only shows produced by SEM, (ii) to persuade RIBA members to exhibit at those shows, and (iii) to permit SEM to use RIBA's name for

3

promotional purposes. In turn, SEM undertook, inter alia, to (i) obtain all necessary leases, licenses, permits and insurance, (ii) indemnify RIBA for show-related losses "of whatever sort," (iii) accord RIBA the right to accept or reject any exhibitor, (iv) audit show income, and (v) advance all the capital required to finance the shows. Net show profits were to be shared: 55% to SEM; 45% to RIBA.

The 1974 Agreement further provided that all show dates and admission prices, as well as the Rhode Island banking institution at which show-related business would be transacted, were to be mutually determined by the parties. In the event the Civic Center were to become unavailable for reasons beyond SEM's control, SEM was to be excused from its production duties, provided that SEM promoted no other home show in Rhode Island during the interim; and RIBA retained the right to conduct a home show at another venue, upon appropriate notification to SEM.

In contemporaneous conversations relating to the meaning of the term "partners," Manual Sherman, SEM's president, informed RIBA's Ross Dagata that he "wanted no ownership of the show," because he was uncertain about the financial prospects for home shows in the Rhode Island market. Manual Sherman advised Dagata: "[A]fter the first year, if I'm not happy, we

can't produce the show properly or make any money, we'll give you back the show."  Although SEM owned other home shows which it produced outside Rhode Island, Manual Sherman consistently described himself simply as the "producer" of the RIBA shows.

In 1994, following a series of assignments and contract renewals agreed to by RIBA, Southex acquired SEM'S interest under the 1974 Agreement.[1]  By 1998, Southex determined that in order to maintain its financial stake in the RIBA home shows, the 1974 Agreement either needed to be renegotiated or allowed to expire according to its terms in 1999.  RIBA in turn expressed dissatisfaction with Southex's performance, and eventually entered into a management contract with another producer, Yoffee Exposition Services, Inc.

Southex commenced suit against RIBA in federal district court, to enjoin the RIBA 2000 home show, alleging that the 1974 Agreement established a partnership between RIBA and Southex's predecessor-in-interest (i.e., SEM), and/or that by its silence RIBA had enabled the formation of a partnership-by-estoppel, and

---

[1]With regard to the acquisition by Southex, RIBA's Dagata inartfully advised the Providence Journal that Reed Exhibitions, SEM's successor-in-interest, had "sold its home shows to Southex."  One month later, an article appeared in an RIBA trade publication entitled:  "Southex Exhibitions acquires Home Show." (Emphasis added.)  In each instance, however, RIBA mitigated any inference of co-ownership by referring to Southex as the "producer" of its shows.

that RIBA breached its fiduciary duties to its co-partner, Southex, by its wrongful dissolution of their partnership and its subsequent appointment of another producer.  Following an evidentiary hearing, the district court denied the preliminary injunction requested by Southex, finding no likelihood of ultimate success on the merits.  We affirmed in an unpublished opinion.  See Southex Exhibitions, Inc. v. R.I. Builders Ass'n, No. 00-1247, slip op. at 2 (1st Cir. Mar. 2, 2000) (per curiam).

    At the bench trial following our remand, the district court entertained further evidence, then entered judgment for RIBA on the ground that the 1974 Agreement established no partnership under Rhode Island law, and that Southex had adduced insufficient evidence to support its partnership-by-estoppel claim.  In due course, Southex brought the instant appeal.

## II

## DISCUSSION

    Under Rhode Island law, a "partnership" is "an association of two (2) or more persons to carry on as co-owners a business for profit . . . ."  R.I. Gen. Laws. § 7-12-17 (emphasis added).  The same statute further provides, inter alia, that —

> [i]n determining whether a partnership exists, these rules apply:
>
> . . . .

6

(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether the co-owners do or do not share any profits made by the use of the property.

. . . .

(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he or she is a partner in the business, but no such inference is drawn if profits were received in payment:

(i) As a debt by installments or otherwise;

(ii) As wages of an employee or rent to a landlord;

(iii) As an annuity to a widow or representative of a deceased partner;

(iv) As interest on a loan, though the amount of payment vary with the profits of the business;

(v) As the consideration for the sale of a good will of a business or other property by installments or otherwise.

Id. § 7-12-18.[2]

---

[2]Although there is a dearth of Rhode Island case law construing section 7-12-18, the Rhode Island legislature has counseled the courts to look to the interpretations which other states have given the Uniform Partnership Act (UPA), upon which section 7-12-18 is based. See R.I. Gen. Laws § 7-12-15(d). We heed its counsel. See VanHaaren v. State Farm Mut. Auto. Ins. Co., 989 F.2d 1, 3 (1st Cir. 1993) ("Absent controlling state court precedent, a federal court sitting in diversity may certify a state law issue to the state's highest court, or undertake its prediction 'when the course [the] state courts

While pure legal issues, such as statutory interpretations, are reviewed de novo, see R.I. v. Narragansett Indian Tribe, 19 F.3d 685, 691 (1st Cir. 1994), the determination as to whether a partnership was formed turned primarily on factual findings,[3] which we review only for clear error.[4] A finding of fact constitutes clear error only if, after reviewing the entire trial record, "we are firmly convinced that a mistake has been made." See Tokyo Marine & Fire Ins. Co. v. Perez & CIA, de Puerto Rico, Inc., 142 F.3d 1, 11 (1st Cir. 1998) (emphasis added). As the party asserting that a partnership was formed, the ultimate burden of persuasion rested upon Southex.[5]

---

would take is relatively clear.'") (citation omitted).

[3]See, e.g., In re Hassiepen, 646 N.E.2d 1348, 1353 (Ill. App. Ct. 1995); Hofer v. St. Clair, 381 S.E.2d 736, 739 (S.C. 1989).

[4]See, e.g., Boeckmann v. Mitchell, 909 S.W.2d 308, 312 (Ark. 1995); Widdoss v. Donahue, 331 N.W.2d 831, 833 (S.D. 1983); accord In re Hassiepen, 646 N.E.2d at 1353 (factfinder's determination can be vacated only if contrary to "the manifest weight of the evidence").

[5]See Boeckmann, 909 S.W.2d at 312; In re Hassiepen, 646 N.E.2d at 1353; Tralmer Sales & Serv., Inc. v. Erickson, 521 N.W.2d 182, 187 (Wis. Ct. App. 1994). Although some courts require that partnership formation be established by clear and convincing evidence, see Cochran v. Bd. of Supervisors of Del Norte County, 85 Cal. App. 3d 75, 81 (Ct. App. 1978), for present purposes we assume, arguendo, that the Rhode Island courts would adhere to the less burdensome preponderance-of-the-evidence standard.

Southex insists that the 1974 Agreement contains ample indicia that a partnership was formed, including: (1) a 55-45% sharing of profits; (2) mutual control over designated business operations, such as show dates, admission prices, choice of exhibitors, and "partnership" bank accounts; and (3) the respective contributions of valuable property to the partnership by the partners. Given the highly deferential standard of appellate review, however, Southex must do more than point to supportive record evidence. Since it bears the burden of proof, it must demonstrate that the district court ruling, viewed in the light most favorable to RIBA, is not <u>rationally</u> supported by the record evidence. <u>See</u> <u>Damon</u> v. <u>Sun. Co.</u>, 87 F.3d 1467, 1477 (1st Cir. 1996). In our view, the record evidence indicating a nonpartner relationship cannot be dismissed as insubstantial.

First, the 1974 Agreement is simply entitled "Agreement," rather than "Partnership Agreement." Second, rather than an agreement for an indefinite duration, it prescribed a fixed (albeit renewable) term. Third, rather than undertake to share operating costs with RIBA, SEM not only agreed to advance <u>all</u> monies required to produce the shows, but to indemnify RIBA for <u>all</u> show-related <u>losses</u> as well. State law normally presumes that partners share equally or at least proportionately in partnership losses. <u>See</u> R.I. Gen. Laws §§ 7-

9

12-26(a), 7-12-29(1)&(2). Although partners may agree to override such statutory "default" provisions, there is no evidence that SEM and RIBA meant to do so notwithstanding an intent to form a partnership. See 1 Alan R. Bromberg & Larry E. Ribstein, Bromberg and Ribstein on Property § 2.07(d) (1999) (identifying "loss sharing" as very important partnership attribute).

Similarly, although RIBA involved itself in some management decisions, SEM was responsible for the lion's share. Cf. R.I. Gen. Laws § 7-12-29(5) (noting default rule that partners normally share "equal rights in management"). Furthermore, Southex not only entered into contracts but conducted business with third parties, in its own name, rather than in the name of the putative partnership. As a matter of fact, their mutual association was never given a name. It is noteworthy as well that Southex stipulated at trial that it never filed either a federal or state partnership tax return. See Cochran v. Bd. of Supervisors of Del Norte County, 85 Cal. App. 3d 75, 82 (Ct. App. 1978) (failure to file partnership tax return probative of nonpartner relationship); Wilder v. Hobson, 398 S.E.2d 625, 627 (N.C. Ct. App. 1990) ("Filing a partnership tax return is significant evidence of a partnership."); Widdoss v. Donahue, 331 N.W.2d 831, 833 (S.D. 1983).

10

Similarly, the evidence as to whether either SEM or RIBA contributed any corporate property, with the intent that it become jointly-owned partnership property is highly speculative, particularly since their mutual endeavor simply involved a periodic event, i.e., an annual home show, which neither generated, nor necessitated, ownership interests in significant tangible properties, aside from cash receipts.  Unlike tangible real and personal property, whose ownership is more readily established (e.g., by documentary evidence and public records), see, e.g., Harrell Oil Co. of Mt. Airy v. Case, 543 S.E.2d 522, 525 (N.C. Ct. App. 2001) (finding "overwhelming" evidence of ownership in "building, the property, the inventory, and the equipment"), the intangible intellectual property involved here, such as clientele lists, goodwill, and business expertise, did not so readily lend itself to evidentiary establishment.  As a consequence, in the present circumstances the requisite mutual intent to convert intangible intellectual properties into partnership assets may well depend much more importantly upon a clear contractual expression of mutual intention to form a partnership.

Finally, even assuming that the 1974 Agreement, as a whole, is ambiguous, (i) Manuel Sherman testified that he regarded SEM as simply the producer of the annual RIBA shows;

11

and (ii) Dagata testified that SEM specifically disclaimed any ownership interest in the home shows in 1974. See Boeckmann v. Mitchell, 909 S.W.2d 308, 312 (Ark. 1995) (where testimony relates to partnership formation, appellate court must defer to trial court as primary arbiter of witness credibility).

Next, Southex asserts that the district court committed reversible error by not crediting undisputed evidence that RIBA, in 1974, expressly agreed to share business profits with SEM. Southex reasons that since the Rhode Island partnership statute makes such profit sharing prima facie evidence of partnership formation, and RIBA failed to rebut that evidentiary presumption by establishing any of the five exceptions specified in subsection 7-12-18(4), the district court was required to find, as a matter of law, that a partnership was formed. Its reasoning is flawed.

"Partnership" is a notoriously imprecise term, whose definition is especially elusive in practice. See Boeckmann, 909 S.W.2d at 312 ("[T]he term 'partnership' is not easily elucidated [and] . . . [t]he business association that is known in the law as partnership is not one that can be defined with precision. To the contrary, a partnership is a contractual relationship that may vary, in form and substance, in an almost infinite variety of ways.") (citation omitted). Since a

12

partnership can be created absent any written formalities whatsoever, its existence <u>vel</u> <u>non</u> normally must be assessed under a "totality-of-the-circumstances" test.[6]

Furthermore, the courts frequently consider indicia of partnership formation not prescribed in the UPA, such as the extent to which the putative partners respectively exercised control over the entity's business operations, <u>see</u>, <u>e.g.</u>, <u>McAleer</u> v. <u>Smith</u>, 818 F. Supp. 486, 493 (D.R.I. 1993), <u>aff'd</u>, 57 F.3d 109 (1st Cir. 1995), or whether the entity filed partnership tax returns, <u>see</u>, <u>e.g.</u>, <u>Wilder</u>, 398 S.E.2d at 628. Yet, though these considerations constitute "necessary guidepoints of inquiry, . . . none is conclusive." <u>Beckman</u> v.

---

[6]<u>See</u>, <u>e.g.</u>, <u>Holmes</u> v. <u>Lerner</u>, 74 Cal. App. 4th 442, 443 (Ct. App. 1999) (considering "terms of their agreement, conduct, and the surrounding circumstances"); <u>Cochran</u>, 85 Cal. App. 3d at 81 (noting that the "terms of their agreement is, of course, a crucial factor . . . as are the conduct of the parties and the surrounding circumstances"); <u>Beckman</u> v. <u>Farmer</u>, 579 A.2d 618, 628 (D.C. 1990) (noting that primary statutory criteria, like profit sharing, "'take[] on greater or lesser importance as an independent element of partnership depending on the extent to which there is other evidence supporting partnership'") (citation omitted); <u>In re Hassiepen</u>, 646 N.E.2d at 1354 ("The trial court must review all facts and circumstances surrounding the formation of the business."); <u>Harrell Oil Co.</u>, 543 S.E.2d at 525; <u>Wilder</u>, 398 S.E.2d at 627 ("Existence of a partnership does not require an express agreement and the parties' intent to formulate a partnership can be inferred by the conduct of the parties by examining all the circumstances."); <u>Roberts</u> v. <u>Lebanon Appliance Serv. Co.</u>, 779 S.W.2d 793, 795 (Tenn. 1989) (noting that partnership determination turns on "consideration of the totality of all relevant facts").

Farmer, 579 A.2d 618, 627 (D.C. 1990); see Holmes v. Lerner, 74 Cal. App. 4th 442, 454 (Ct. App. 1999) ("[T]he presence or absence of any of the various elements set forth in [the UPA] . . . is not necessarily dispositive.").

Similarly, even though the UPA explicitly identifies profit sharing as a particularly probative indicium of partnership formation, and some courts have even held that the absence of profit sharing compels a finding that no partnership existed, see, e.g., Harrell Oil Co., 543 S.E.2d at 525 ("'[C]o-ownership and sharing of any actual profits are indispensable requisites for a partnership.'") (citation omitted), it does not necessarily follow that evidence of profit sharing compels a finding of partnership formation. See, e.g., Boeckmann, 909 S.W.2d at 312 ("[S]haring of profits alone does not make one a partner."); Holmes, 74 Cal. App. 4th at 454 & n.14 ("[P]rofit sharing [is] evidence of a partnership, rather than a required element of the definition of a partnership," and the UPA simply establishes an "evidentiary presumption."); Wilder, 398 S.E.2d at 627 ("[S]haring profits does not of itself establish a partnership.").

Furthermore, even though the UPA specifies five instances in which profit sharing does not create a presumption of partnership formation, see R.I. Gen. Laws § 7-12-18(4)(i)-

14

(v), <u>supra</u>, Southex cites (and we have found) no authority for the proposition that the evidentiary presumption created by profit sharing can be overcome <u>only</u> by establishing these five exceptions, rather than by competent evidence of other pertinent factors indicating the absence of an intent to form a partnership (<u>e.g.</u>, lack of mutual control over business operations, failure to file partnership tax returns, failure to prescribe loss-sharing). Thus, the undisputed evidence of profit sharing did not compel a determination that Southex and RIBA formed a partnership. Instead, the validity of the ruling below depends upon whether the district court correctly assessed the totality of the circumstances. <u>See</u> <u>supra</u> note 6.

Southex next urges that the 1974 Agreement necessitated a finding of partnership formation, in that it unambiguously describes the contracting parties as "partners." Consequently, Southex insists, the district court erred by considering extrinsic evidence regarding the meaning of the term "partners," <u>viz.</u>, by crediting testimony that RIBA and Southex's predecessor did not intend, in 1974, to employ the term "partners" in its strict legal sense, but merely in its colloquial sense, as a "cooperative joint effort." Further, Southex asserts that because RIBA concededly reviewed the 1974 Agreement with

counsel, we must presume that the term "partners" was employed in its strict legal sense. Once again we must disagree.

First, the term "partner" frequently is defined with a view to its context. See Commonwealth v. Campbell, 616 N.E.2d 430, 432 (Mass. 1993) ("[T]he word 'partner' has also been known to describe other kinds of relationships, as diverse as husband and wife or two people who dance together."). Yet, the present record contains no conclusive evidence as to whether the 1974 Agreement was drafted by a layman or by an attorney.

More importantly, the labels the parties assign to their intended legal relationship, while probative of partnership formation, are not necessarily dispositive as a matter of law, particularly in the presence of countervailing evidence — e.g., the provision in the 1974 Agreement indemnifying RIBA for all show-related losses — which would tend to refute the partnership characterization. See Beckman, 579 A.2d at 627 ("[A]lthough the manner in which the parties themselves characterize the relationship is probative, the question ultimately is objective [intent]."); Grimmett v. Higginbotham, 907 S.W.2d 1, 2 n.3 (Tex. App. 1994) ("There is significant authority that representations by the parties in documents or to third parties that a partnership relationship

16

exists constitutes a legal conclusion and is not determinative of the relationship.").

Although the courts should refrain from resorting to extrinsic evidence where a contract is utterly unambiguous, see Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989), the lone reference to "partners" in the 1974 Agreement's prefatory clause is so inconclusive as to carry minimal interpretive weight, especially since it arguably conflicted with other contract provisions.[7]  Had the parties intended otherwise, it would seem entirely reasonable to expect the 1974 Agreement to have been entitled "Partnership Agreement," rather than simply "Agreement."

Southex next contends that the district court erred by relying upon Dagata's testimony, viz., that he may have intended to form a partnership in the production of the home shows, but not in relation to the parties' joint use and ownership of the physical property involved in conducting the business.  As

---

[7]The cases cited by Southex represent somewhat more persuasive authority for finding partnership formation, since they did not simply involve a single reference to "partners" in the written agreement. See, e.g., Plainview Milk Prods. Coop. v. Marron Foods, Inc., 3 F. Supp. 2d 1074, 1077 (D. Minn. 1998) (finding partnership formation where agreement called relationship a "partnership" and referred to "partnership equipment," and where parties concededly made extracontractual references to their relationship, "from time to time," as a partnership).

17

Southex sees it, this finding constituted legal error because (i) the law recognizes no such "production-only" or "non-ownership" partnership; and (ii) the undisputed evidence demonstrates that each contracting party contributed "property" (e.g., clientele, goodwill or expertise) to the partnership. These contentions are immaterial.

First, it is unnecessary to determine whether Rhode Island law would recognize a "production-only" or "non-ownership" partnership, because it is clear that the absence of any joint-property ownership is an entirely legitimate criterion for determining that no cognizable partnership was ever formed. See McAleer, 818 F. Supp. at 493; Harrell Oil Co., 543 S.E.2d at 525 ("'[C]o-ownership . . . [is] [an] indispensable requisite[] for a partnership.'") (citation omitted). Consequently, the reference to a "production-only" or "non-ownership" partnership is immaterial, since Dagata is not competent to opine on Rhode Island partnership law. Instead, the question is whether the district court's determination — that the absence of any co-ownership of property weighed against a finding of partnership formation — constituted clear error. It did not.

Southex further contends that the district court finding that Dagata, "a layman with no legal training," drafted the 1974 Agreement, constituted reversible error because (i)

18

there is no evidence as to the identity of the drafter, and (ii) in any event, Dagata reviewed the 1974 Agreement with counsel. Assuming, arguendo, that the district court erred, the error was harmless. See Moulton v. Rival Co., 116 F.3d 22, 26 (1st Cir. 1997) ("'[T]he standard for reviewing a district court's nonconstitutional error in a civil suit requires that we find such error harmless if it is highly probable that the error did not affect the outcome of the case.'") (citation omitted).

The passing reference to Dagata's role as draftsman was but one of several alternative grounds upon which the district court rejected Southex's contention that the reference in the 1974 Agreement to "partners" was dispositive. The district court noted as well (i) that the term "partners" appeared "only once and only in the preamble of the agreement," (ii) the 1974 Agreement was "not labelled as a partnership agreement," (iii) the 1974 Agreement was "devoid of many of the provisions ordinarily found in [a] partnership agreement," including a "provision for the distribution of assets upon termination [of the partnership]," and (iv) the 1974 Agreement contained other provisions inconsistent with an intent to form a partnership, such as its limited five-year term, SEM's full indemnification

19

of RIBA, and SEM's commitment to advance all expenditures for the shows.[8]

Further, the district court identified extrinsic evidence that Manual Sherman disclaimed any ownership interest in the shows, that Southex never asked RIBA in 1994 whether Southex was acquiring a partnership interest, and that Southex had entered into related third-party contracts in its name alone, rather than any partnership name. Given these alternative holdings, we are unable to conclude that there existed the requisite "high probability" that any misperception regarding Dagata's draftsmanship affected the outcome below.

---

[8]Southex contests various evidentiary rulings as well. For instance, it argues that the district court admitted hearsay testimony, by Ross Dagata, that Manual Sherman expressly disclaimed any ownership interest in the shows. RIBA counters that the Dagata testimony came within an exception to the hearsay rule, since Dagata testified as to Manual Sherman's state of mind or intent in signing a contract which contained the word "partners." See Fed. R. Evid. 803(3). In reply, rather than explaining why Rule 803(3) is inapposite, Southex merely contends that RIBA adduced no evidence that Manual Sherman made this remark at or about the time he executed the 1974 Agreement.

We review rulings under Evidence Rule 803(3) only for abuse of discretion. See Colasanto v. Life Ins. Co. of N. Am., 100 F.3d 203, 212-13 (1st Cir. 1996). The district court acted well within its discretion in finding that Manual Sherman, a sophisticated businessman, likely would have made his statement to Dagata, regarding his understanding of a contract, before he executed the contract. Indeed, Dagata testified that Manual Sherman stated that "[h]e wanted no ownership of the show . . . . [a]nd . . . we came to an agreement." The other evidentiary challenges asserted by Southex are unfounded as well.

20

Finally, Southex suggests that the district court erred in rejecting its partnership-by-estoppel claim. Southex contended that even if the 1974 Agreement itself established no cognizable partnership, RIBA had the legal duty to so inform Southex in 1994, at the time Southex acquired its rights under the 1974 Agreement, and that RIBA's failure to do so estops it from denying partnership formation now.

We review equitable estoppel rulings under a bifurcated standard, assessing legal conclusions de novo and findings of fact for clear error only. See Ludlow Hosp. Soc'y, Inc. v. Sec'y of Health and Human Servs., 124 F.3d 22, 25 n.6 (1st Cir. 1997). Southex had the burden to prove: "'[1] an affirmative representation or equivalent conduct on the part of the person against whom the estoppel is claimed [viz., RIBA] which is directed to another [viz., Southex] for the purpose of inducing the other to act or fail to act in reliance thereon; and . . . [2] that such representation or conduct in fact did induce the other to act or fail to act to his injury.'" Providence Teachers Union v. Providence Sch. Bd., 689 A.2d 388, 391-92 (R.I. 1997) (citation omitted). "Silence [also] . . . can be the basis for estoppel where there exists a duty not to remain silent as where the circumstances require one to speak lest such silence would reasonably mislead another to rely thereon to his

21

detriment."  Schiavulli v. Sch. Comm. of Town of N. Providence,

334 A.2d 416, 419 (R.I. 1975).

On the other hand, equitable estoppel is "extraordinary" relief, which "will not be applied unless the equities clearly [are] balanced in favor of the part[y] seeking relief."  Greenwich Bay Yacht Basin Assocs. v. Brown, 537 A.2d 988, 991 (R.I. 1988) (emphasis added).[9]  As the party asserting

---

[9]To the extent Southex based its estoppel claim on the Rhode Island statute, it is more than arguable that the UPA estoppel provision simply creates rights of action against partners by third parties (i.e., non-partners), rather than rights inter se alleged co-partners such as Southex.  See, e.g., Vergos v. Waterman Bldg. P'ship, 613 So.2d 383, 389 (Ala. 1993).  The Rhode Island partnership statute provides, in pertinent part:

> When a person, by words spoken or written or by conduct, represents him or herself, or consents to another representing him or her to any one, as a partner in an existing partnership or with one or more persons not actual partners, he or she is liable to any person to whom the representation has been made, who has, on the faith of the representation, given credit to the actual or apparent partnership, and if he or she has made a representation or consented to its being made in a public manner he or she is liable to the person, whether the representation has or has not been made or communicated to the person giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made.

R.I. Gen. Laws § 7-12-27.  On the other hand, it is arguable as well that putative co-partners may still invoke the common-law doctrine of equitable estoppel.  See Vergos, 613 So.2d at 389. We therefore assume, arguendo, that the Rhode Island courts

22

the equitable estoppel claim, Southex bore the ultimate burden of proof. See Steinke v. Sungard Fin. Sys., Inc., 121 F.3d 763, 776 (1st Cir. 1997).

A finding of fact is not to be disturbed under the clear error standard of review unless "we are firmly convinced," after reviewing all the evidence, "that a mistake has been made." Tokyo Marine, 142 F.3d at 11. Southex identifies three pieces of evidence which purportedly created an affirmative duty on the part of RIBA to inform Southex, in 1994, that Southex was not acquiring a partnership interest; viz. (i) the reference to "partners" in the 1974 Agreement; (ii) the statements Dagata made to the local press that Reed Exhibitions had "sold its home shows to Southex," supra note 1; and (iii) an article, in a 1994 RIBA trade publication, entitled: "Southex Exhibitions acquires Home Show," id.

Based on the trial record, the district court reasonably could have found the following facts. Since the 1974 Agreement is ambiguous, in that it included no clear representation by RIBA that it regarded its relationship with SEM as a partnership, both RIBA and Southex were placed on fair notice to inquire into the nature of their relationship. Yet, at no time during the pre-transfer discussions between the

permit such a cause of action.

23

Southex and RIBA representatives did either party raise the issue regarding whether Southex was to acquire ownership rights in the RIBA shows. Furthermore, RIBA merely consented to the 1994 agreement between Reed and Southex, whereby Reed transferred its rights under the 1974 Agreement, which consent neither necessitated nor implied any viewpoint on the part of RIBA regarding the nature of the contractual rights thereby transferred.[10] The pertinent transfer occurred between Southex and Reed. Southex neither established that it did not rely on Reed's representations, nor that but for RIBA's silence it would not have acquired the rights to produce either the RIBA shows or the two other shows it simultaneously purchased from Reed along with the RIBA contract.

Finally, like the 1974 Agreement itself, the two post-consent statements RIBA made to the press — allegedly proclaiming Reed's ownership rights in the RIBA shows — were internally contradictory as well as ambiguous, and, if anything, should have placed Southex on "additional inquiry" notice.

---

[10]Southex insists that its request that RIBA consent to the Reed-Southex transfer, together with the fact that RIBA's consent mentions the 1974 Agreement, "clearly" establish Southex's reliance. We cannot agree that such a request, reasonably asserted by parties attempting to assign a personal-services-type contract, necessarily implied a further request for RIBA's opinion regarding the nature of the contractual rights transferred. Simply put, Southex sought no such opinion.

24

While employing ambiguous terms, such as "sold" and "acquires," which reasonably could portend <u>either</u> a transfer of partnership <u>or</u> nonpartnership rights, RIBA described Southex as the "producer" of the RIBA shows. Thus, the district court permissibly determined that Southex did not exercise due diligence in ascertaining and/or clarifying the terms of the 1974 Agreement which it was about to assume, and, consequently, that the equities did not clearly weigh in its favor. <u>See</u> <u>Greenwich Bay Yacht</u>, 537 A.2d at 991.

<u>Accordingly, the district court judgment is affirmed</u>; <u>costs are assessed against appellant</u>. **SO ORDERED**.