DECISION
Before this Court is the plaintiff, Dennis Acinapura's ("plaintiff" or "Acinapura" or "Pace"[1]), petition for damages resulting from the defendants' alleged breaches of contract and fiduciary duties, as well as the defendants' counter-claims for lost profits resulting from the plaintiff's alleged breach of contract. The parties have timely filed their respective claims and counter-claims, and the prayers for relief allege damages in excess of the statutory amount-in-controversy. This Court has jurisdiction pursuant to G.L. 1956 § 8-2-14.
 FACTS/TRAVEL
The plaintiff was the one-time sole proprietor of a publishing entity and its concomitant monthly magazine, respectively known as Homeowners Publishing ("Homeowners") and New England For Sale By Owner Magazine ("NEFSBO" or the "Magazine"). The Magazine served as a property-listing guide for local commercial and residential real-estate owners. For a fee, which was to be remitted to the plaintiff's post office box (the "P.O. Box"), interested parties could have their properties listed as currently for-sale. Apparently suffering from financial problems in 1998, the plaintiff placed an ad in the Providence Journal (the "Journal"), advertising his wish to sell Homeowners and NEFSBO. In response to the Journal advertisement, John Natalizia and Paul Basile (collectively known as "defendants" and respectively known as "Natalizia" and "Basile") commenced negotiations with the plaintiff regarding their purchase of and/or participation in Homeowners and NEFSBO.
On March 12, 1998, the parties memorialized their agreement into a document termed "Purchase and Sale Agreement" (the "PSA"); the legal relationship between the parties purportedly created by the PSA forms the basis of the instant litigation. Pursuant to the PSA, the plaintiff agreed to sell a "controlling interest" of Homeowners and NEFSBO to the defendants. PSA, at 1. Included in the defendants' purchase was their acquisition of "all common law publishing rights," as well as the "exclusive name reservation rights" in the State of Rhode Island and the Commonwealth of Massachusetts with respect to NEFSBO. Id. The PSA, however, does not specifically define these terms. In return, the defendants agreed to compensate the plaintiff with a cash payment of twelve-thousand dollars ($12,000). The PSA also delineated additional, performance-based, compensation payable to the plaintiff should certain contingencies be met. Specifically, the PSA stated that the plaintiff would be entitled to
 "2) $4,000 on May 1, 1998 (assuming cash receipts during the month of April 1998 equal or exceed printing and distribution costs for the May issue);
 3) $4,000 on June 1, 1998 (assuming cash receipts during the month of May 1998 equal or exceed printing and distribution costs for the June issue);
 4) Base compensation equal to 50% of the first $75,000 of annual cash receipts to be paid on a monthly basis by the 5th day of the month subsequent to the month on which cash receipts are received.
 5) Incremental cash receipts above $75,000 annually will be distributed 85% to Buyers and 15% to Seller. Payment to Seller of this "incentive" compensation will be made in the month subsequent to the month in which aggregate cash receipts exceed $75,000.
 6) If cash receipts in any consecutive 12-month period during the 36-month period beginning on April 1, 1998 exceeds $150,000, a one-time cash bonus payment of $10,000 will be made to Seller." Id.
Additionally, the PSA contained the following language relative to the parties' remaining obligations:
 "Buyers agree to produce and distribute at least 14,000 copies of [NEFSBO] each month, except that buyers reserve the right to combine the December and January issues and to produce and distribute at least 14,000 copies of this combined issue. Buyers assume the responsibility for all costs and risks of ownership from March 12, 1998 until the time at which they shall cease ownership. Buyers will approve and pay all invoices directly, except that if Seller incurs reasonable out of pocket business expenses and presents receipts to buyers on a timely basis, he shall be reimbursed in the month in which these business expenses are incurred.
 Buyers shall be responsible for such activities as typing, filing, bookkeeping and mailing. In addition, Buyers agree to provide for all desktop publishing services.
 Buyers agree to honor all outstanding free advertising and coupon offers.
 Seller agrees to work diligently, in order that a business level at least equal to an average of recent years is achieved. It is agreed that such a business level shall include approximately 500 new customers annually. Seller agrees that any "incentive" and "bonus" payments are contingent upon his diligent efforts to help Buyers achieve business levels above an average of recent years.
 Buyers shall have the right to discontinue payments to and/or terminate their relationship with Seller if Seller's efforts and/or performance does not meet their (Buyers') standards which by mutual agreement shall be reasonable and consistent with similar business activities. Seller shall have the right to appeal such discontinuance of payments and/or 3 termination to a disinterested third party who by mutual agreement has the requisite knowledge and expertise to mediate; and the Buyers agree to make reasonable and timely efforts to remediate before termination. . . ." Id. at 1-2.
Subsequent to the PSA's execution, the parties commenced their business relationship, purportedly in accordance with the terms of that document. At least until November, 1998, the plaintiff actively solicited and brought in new advertisements for NEFSBO, while the defendants managed various aspects of the Magazine's production and publication. In December, 1998, however, the parties' business relationship soured. The plaintiff, upon returning from vacation, discovered that the defendants had purchased another publishing company known as Sprague Publishing ("Sprague") and had directed that all remittances intended for NEFSBO advertisements be sent to Sprague's business address. Ostensibly believing that as the defendants' partner he should have been consulted with regard to these changes, the plaintiff initiated several telephone and facsimile contacts with the defendants objecting to their actions. Ultimately, the plaintiff contended, the defendants' actions were breaches of their fiduciary duties to him. The defendants, while not acknowledging the existence of a partnership with the plaintiff, indicated in a January 6, 1999 letter to the plaintiff that his position as marketing director for NEFSBO had not been eliminated. Other than the present litigation, the January 6, 1999 letter apparently constituted the last formal contact between the plaintiff and the defendants as the plaintiff has ceased soliciting advertisements on behalf of either Homeowners or NEFSBO since November, 1998. Subsequently, NEFSBO and Homeowners ceased doing business, and the defendants terminated their partnership with each other.
 CONTRACT AND PARTNERSHIP ISSUES
The plaintiff avers that, pursuant to the PSA, he and the defendants were partners with respect to Homeowners and NEFSBO and, as such, the defendants' failure to consult him regarding the purchase of Sprague and the change in remittance addresses constituted breaches of their fiduciary duties to him. Specifically, the plaintiff contends that by directing NEFSBO's prospective customers to remit advertisement checks to Sprague, the defendants' impermissibly co-mingled Homeowners and Sprague assets in contravention of their fiduciary obligations to him. The plaintiff also maintains that, pursuant to the PSA, he was entitled to receive fifty percent (50%) of NEFSBO's profits regardless of whether he solicited advertisements from November, 1998 and thereon. Accordingly, the plaintiff has petitioned this Court for an award of damages equal to the sum of two-hundred-fifty-thousand dollars ($250,000), as well as an accounting of NEFSBO's finances. Conversely, the defendants contend that they were not in partnership with the plaintiff, rather, he was an independent contractor working on their behalf. The defendants maintain that because they purchased a controlling interest in Homeowners and NEFSBO, they had exclusive control over those entities and that, in any event, all three parties negotiated for and consummated the sale of the plaintiff's interest rather than the formation of a partnership. The defendants counter-claim that because the plaintiff abruptly stopped working in November, 1998 he breached his employment contract with the defendants, causing them lost profits. Accordingly, the defendants have petitioned this Court for an award of damages equal to the lost profits allegedly caused by the plaintiff.
With respect to contract formation, it is well-accepted that the potential parties to a contract must mutually assent to a contract's essential terms before such a legal relationship is formed; essentially, there must exist what is frequently referred to as a `meeting of the minds.' 1 Arthur Linton Corbin, Corbin on Contracts § 4.13 at 634-636 (Joseph M. Perillo ed., rev ed. 1993). Without such objective manifestations of mutual assent, courts will often find that a contract was not, in fact, formed. Id. As to written memorializations of parties' agreements, it has been said that
 "[a] court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract. They must have expressed their intentions in a manner capable of being understood. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of the agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract." Id. § 4.1 at 525.
Simply stated, "the terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." Id. at 529. Any ambiguities in a contract, however, should be narrowly construed against its drafter unless such documents are the product of mutual negotiations in an arm's length transaction. 59A Am. Jur.2d Partnership § 123 (1987) at 302; RhodeIsland Depositors Insurance Protection Corp. v. Coffey and Martinelli,Ltd., 821 A.2d 222 (R.I. 2003). In the latter case, a court may, therefore, give a broader construction to a contract's terms. Id.
Despite these general principles, however, it has also been said that "[e]ven though parties have expressed an agreement in terms so vague and indefinite as to be incapable of interpretation with a reasonable degree of certainty, they may cure this defect by later verbal clarification or their subsequent conduct that indicates their own practical interpretation." Id. § 4.7 at 606. Furthermore, it has been said that "[e]ven if the subsequent conduct of the parties does not make clear the meaning of their original expressions, it may be such as to create a new and definite tacit contract." Id. at 610. However, "[i]f the subsequent conduct is regarded as the making of a new tacit contract, the [applicable statute of frauds] may make it unenforceable. . . ." Nevertheless, it must be remembered that "a new tacit contract, differing materially from a former agreement, may be made enforceable by reason of its part performance and without any writing whatever even though it is clearly within the statute of frauds." Id. at 611-612.
As to partnerships and their formation, G.L. 1956 § 7-12-17, also known as the Uniform Partnership Act (the "UPA"), defines a partnership as "an association of two or more persons to carry on as co-owners of a business for profit. . . ." G.L. 1956 § 7-12-17. In determining the existence of a partnership, it is generally well-recognized that "theintent of the parties to a partnership agreement is the critical factor
in determining when a partnership commences, and the parties' intent should be ascertained as a question of fact." 59A Am. Jur.2d Partnership
§ 78 at 276. Section 7-12-18 of the Rhode Island General Laws states in pertinent part that
 "[i]n determining whether a partnership exists . . .
 (2) joint property . . . or part ownership does not of itself establish a partnership, whether the co-owners do or do not share any profits made by the use of the property.
 ***
 (4) [t]he receipt by a person of a share of the profits of a business is prima facie evidence that he or she is a partner in the business, but no such inference is drawn if profits were received in payment . . . [a]s wages of an employee . . . [a]s the consideration for the sale of good will of a business or other property by installments or otherwise." G.L. 1956 § 7-12-18.
As Rhode Island lacks a significant body of case-law, the General Assembly has encouraged Rhode Island courts to look to other states' jurisprudence when interpreting the UPA. Southex Exhibitions v. RhodeIsland Builders Ass'n, 279 F.3d 94, 98 n. 2 (1st Cir. 2002) (noting that "[a]lthough there is a dearth of Rhode Island case-law construing [G.L. 1956 § 7-12-18], the Rhode Island legislature has counseled the courts to look to the interpretations which other states have given to the . . . [UPA], upon which section 7-12-18 is based"). It is well-recognized in other jurisdictions that it is the burden of the party asserting a partnership to prove its existence, Id. at 99, and such a showing, it has been suggested, must be made by a preponderance of the evidence. Id. at 99 n. 5 (noting that "[a]lthough some courts require that partnership formation be established by clear and convincing evidence . . . [since there is a dearth of Rhode Island partnership case-law] we assume, arguendo, that the Rhode Island courts would adhere to the less burdensome preponderance-of-the-evidence standard").
Therefore, while the term partnership "is not easily elucidated," Rhode Island courts must assess partnership according to a "totality-of-the-circumstances" approach. Id. at 100 (citing inter aliaCochran v. Bd. Of Supervisors of Del Norte County, 85 Cal.App.3d 75, 81,149 Cal.Rptr. 304 (1978) where the "terms of [the parties'] agreement is, of course, a crucial factor . . . as are the conduct of the parties and the surrounding circumstances"). Such circumstances often include "indicia of partnership formation not prescribed in the UPA, such as the extent to which the putative partners respectively exercised control over the entity's business operations . . . or whether the entity filed partnership tax returns." Id. at 101; see also Id. at 100 (citingCochran, 85 Cal.App.3d at 82 (failure to file partnership tax return probative of non-partner relationship); Wilder v. Hobson, 101 N.C. App. 199,398 S.E.2d 625, 627 (N.C.Ct.App. 1990) ("[f]iling a partnership tax return is significant evidence of a partnership"). Although these considerations serve as helpful reference points, "`none is conclusive.'"Id. at 101 (quoting Beckman v. Farmer, 579 A.2d 618, 627 (D.C. 1990)). Similarly, courts have noted that while the UPA has placed specific emphasis on profit-sharing as a "particularly probative indicium of partnership formation, and some courts have even held that the absence of profit sharing compels a finding that no partnership existed . . . it does not necessarily follow that evidence of profit sharing compels a finding of partnership formation." Id. (citing inter alia Boeckmann v. Mitchell,322 Ark. 198, 909 S.W.2d 308, 312 (1995) ("[S]haring of profits alone does not make one a partner"). Even the labels that parties' assign to their business relationship, "while probative of partnership formation, are not necessarily dispositive as a matter of law," as the matter is ultimately one of "objective [intent]." Id. at 102.
Presently, the plaintiff has presented this Court with the PSA as evidence of the purported partnership. Id. This document, however, is characterized by "vagueness of expression, indefiniteness and uncertainty as to . . . [its] essential terms. . . ." Corbin, Corbin on Contracts
§ 4.1 at 525. Specifically, the PSA is laden with several patent ambiguities,[2] all of which further muddy the parties' true intentions with respect to their intended business relationship. For example, despite the plaintiff's insistence that a partnership existed, the PSA does not specifically reference an intent to form such a relationship. Rather, the PSA is entitled "Purchase and Sale Agreement" wherein the plaintiff agreed to sell his "controlling interest" in both Homeowners and NEFSBO to the defendants. Despite its inclusion, however, the term "controlling interest" is not clarified. PSA at 1. At trial, the meaning of "controlling interest" was no less ambiguous. For example, the following exchange between plaintiff's counsel and Basile illustrated the latter's understanding of the term:
 " Q. Okay. What did that terminology mean to you then?
 A. It meant that John Natalizia and myself could decide its fate. It could be in business, it could be not in business, it could have its name changed, it could move office locations . . . we could do essentially what we wanted with it.
 Q. Without regard to any minority interest?
 A. Yes. I never understood there to be any minority interest. I thought we were just buying the magazine and it happened to have a name that was printed on the back that said Homeowners Publishing. . . ." Tr. of April 22 and 23, 2003 at 274.
Conversely, the plaintiff testified that "it was my understanding . . . that controlling interest, in the absence of any other percentage, meant 51 percent." Tr. of April 10 and 11, 2003 at 33. Likewise, the PSA provision referring to the defendants' "common law publishing rights and the exclusive name reservation rights in Rhode Island and Massachusetts to the name [NEFSBO]" was ambiguous. PSA at 1. The PSA does not define this phrase and does not indicate what impact it was intended to have on the parties' business relationship. Again, the parties' respective trial testimonials demonstrated their confusion as to the phrase's significance. When asked by plaintiff's counsel "[c]ould you describe to me and this Court what are common law publishing rights?" Basile responded "I have no idea." Tr. of April 22 and 23, 2003 at 276. Alternatively, the plaintiff opined that while he did not recall any discussion between the parties, prior to the PSA's execution, with respect to the meaning of those terms, he
 "understood that if you have a change in ownership, and in this case a new partnership being formed, that you're going to have — the buyers are going to want to make sure that their share is protected by way of a noncompete clause. And I had interpreted that to mean . . . that . . . at no future time would I be able to go out on my own and compete with them." Tr. of April 10 and 11, 2003 at 35.
Accordingly, the specific meanings of these phrases, as well as their significance with respect to the PSA, are not susceptible of clear interpretation. Corbin § 4.1 at 525.
Because the four corners of the PSA do not immediately indicate the parties' intent with respect to the nature of their business relationship, this Court, when faced with this ambiguity, may consider evidence of the parties' subsequent conduct and verbal statements in an effort to clarify the ambiguities in the PSA. Id. § 4.7 at 606. However, in this case, the PSA, even when read within the context of the parties' subsequent conduct and testimony, is no less ambiguous. Specifically, while some of the parties actions or statements demonstrated the indicia of a partnership, other acts or statements indicated that the plaintiff worked for the defendants as an independent contractor. In support of the plaintiff's arguments, there were several occasions between the time the PSA was executed and November, 1998 that showed the parties may have intended the formation of a partnership. At trial, for instance, when asked by plaintiff's counsel whether the concept of a partnership had been discussed or contemplated prior to the PSA's execution, Natalizia maintained that while neither he nor Basile had discussed a partnership agreement with the plaintiff, Natalizia would, however, "have signed it, but I would have to have taken a look at it. And I certainly would not have told him in advance that I wouldn't sign such a document." Tr. of April 22 and 23, 2003 at 118. Evidence was also presented to this Court that upon the commencement of the parties' business relationship, the parties, pursuant to G.L. 1956 § 6-1-1[3], jointly signed and filed a business certificate ("Business Certificate") with the Town of Cumberland ("Town"), listing themselves as joint-owners of Homeowners. When asked at trial why he or Basile would have signed a document which portrayed the plaintiff as an apparently equal co-owner of Homeowners if they did not consider the plaintiff to be a partner, Natalizia responded that the plaintiff's signature was not present when he (Natalizia) had signed. Otherwise, "I wouldn't have signed it if it was there." Id. at 132. When asked why he (Natalizia) didn't sign the document on the first line (which is where the plaintiff's signature presently appears) since he was the first person to sign, Natalizia responded, incredulously, that "I tend to write . . . all over the place . . . so, when I sign something, I give myself plenty of room to sign it." Id. Even assuming, arguendo, that that were true, it is generally well-recognized that business relationships are often assessed based on how the respective parties thereto have objectively held themselves out to the public. Patel v. Patel, 596 N.Y.S.2d 30 (A.D. 1 Dept. 1993) (holding that "the existence of a `business certificate for partners,' signed by defendant . . . is some evidence of a partnership"). Here, despite their purported ignorance of the plaintiff's signature on the Business Certificate, this Court is mindful that the defendants were on constructive notice of that document, as it was filed (albeit with an improper notarization) with the Town, and defendants took no steps to correct any alleged errors. Livingston v. Stevens, 94 N.W. 925, 927 (Iowa, 1903) (holding that "constructive or record notice is such notice as is presumed to be imparted by a recording with the proper authorities a properly drawn and properly acknowledged instrument").
Additionally, the Court heard testimony from both defendants indicating their beliefs that, subsequent to the PSA's execution, the plaintiff was an independent contractor working on their (the defendants') behalves. When questioned by plaintiff's counsel regarding the plaintiff's "legal relationship with Homeowners Publishing . . ." subsequent to the PSA's execution, Basile responded, "I understood he didn't have any . . . [h]e sold it. He sold the name, he sold the magazine, he sold all the things that required [NEFSBO] to be published." Id. at 278. Nevertheless, the testimony before this Court indicates that in August, 1998, Basile, in contravention of the terms of the PSA, solicited financial contributions from the plaintiff in order to offset increasing NEFSBO production expenses. Id. at 195. Indeed, Natalizia testified that, with respect to the unexpected increases in NEFSBO publication expenses,
 "[b]etween the time [the PSA] was signed and whenever [Basile's solicitation of the plaintiff occurred] we were spending significantly more than we anticipated to spend; namely, more magazines printed than we anticipated, more distribution than we anticipated, a lot more money was being paid out than we anticipated . . . [t]hat would have been the context in which I would have discussed with Mr. Basile the urgency of sitting down with Dennis and saying, `Look, do you recognize, Dennis, that this has got to make a profit? Can we agree that that's the basis upon which this relationship has to go forward?'" Id. at 196-197.
Finally, there was undisputed evidence supporting the plaintiff's assertion that a partnership existed because subsequent to the PSA's execution, the plaintiff continued to have exclusive control over the P.O. Box that received advertisement remittances. Tr. of April 10 and11, 2003 at 74; see Southex 279 F.3d at 101 (noting that certain indicators of partnership formation focus on "the extent to which the putative partners respectively exercised control over the entity's business operations. . . .") Evidence was also presented which indicated that from April, 1998 to, at least, September, 1998, the plaintiff maintained a Bay Bank checking account ("Bay Bank Account") in the name of Homeowners, paying various sums to himself (apparently as compensation for his services rendered on behalf of Homeowners, as well as for a payment pursuant to numeral two (2) of the PSA), as well as payments to the defendants from the advertising revenue that was generated. Despite Natalizia's apparent belief, for example, that the plaintiff "would only write checks from that account if he first got approval [from the defendants] . . ." rather than "initiate checks from [the] account", he (Natalizia) concedes that "subsequent[ly] . . . later on I might have got sloppy." Natalizia also opined that because "at the beginning, since we were all getting along fine, [the fact that the plaintiff was the only signatory to the Bay Bank account, and thus, the only party with access thereto] . . . didn't seem to be a problem." Tr. of April 22 and 23,2003 at 219. Basile, likewise, was apparently un-concerned that the plaintiff, purportedly the defendants' independent contractor, had sole access to the Bay Bank account. Specifically, Basile testified that he "considered the Bay Bank account kind of like a bridge account" and that "[e]ventually we would close it." Id. at 301. When asked, however, whether he (Basile) had expressed any concern to the plaintiff that the latter had exclusive access to the account, Basile replied "[n]o. I trusted him. I just didn't think it was appropriate." Id.
On the other hand, this Court had before it equally compelling evidence demonstrating that the parties may not have intended a partnership. A plain reading of the PSA does not reveal an objective intention to form a partnership. 59A Am. Jur.2d Partnership, § 78 at 276 ("intent of the parties to a partnership agreement is the critical factor in determining when a partnership commences"). For instance, the PSA does not refer to the plaintiff as a partner of the defendants; instead, the document appears to memorialize the sale of an undetermined share of the plaintiff's interest in Homeowners and NEFSBO, as well as to include additional performance-based bonuses due to the plaintiff should he generate a sufficient amount of business, see generally PSA — the latter being more consistent with an employment relationship rather than a partnership. 27 Am. Jur. 2 Employment Relationship § 19 (1996) at 570 (one of the essential terms of an employment contract is a discussion of employee compensation). Furthermore, the PSA does not indicate that the plaintiff must bear a portion of losses attributable to NEFSBO and/or Homeowners — an arrangement found in many partnership agreements. 59A Am. Jur.2d Partnership § 172 at 329-330 ("the general rule under the [UPA], and other law, is that an agreement to share losses as well as profits is essential to the existence of a partnership"). The PSA also references the defendants' "right to discontinue payments to and/or terminate their relationship with the [plaintiff] if [his] efforts and/or performance does not meet [the defendants'] standards. . . ." PSA at 2; 27 Am. Jur.2d Employment Relationship § 37 at 584 (under satisfaction contracts, the employer and employee, either expressly or impliedly, agree that the employee's employment shall continue until the employer is dissatisfied with his/her performance). While not dispositive of an employment relationship, this provision demonstrates that the defendants intended to exercise "control and superintendence" over the plaintiff.Deus v. S.S. Peter and Paul Church, 820 A.2d 974, 976 (R.I. 2003). TheSorensson Court found "the determinative factor in the existence of an employer-employee relationship is the employer's right `to exercise control and superintendence over his employees.'" Sorensson v. ColibriCorp., 650 A.2d 125, 129 (R.I. 1994) (quoting Martines v. TerminalMethods, Inc., 101 R.I. 599, 600, 225 A.2d 790, 791 (1967)). Additionally, the PSA provided that the "Seller shall have the right to appeal such discontinuance of payments and/or termination to a disinterested third party who by mutual agreement has the requisite knowledge and expertise to mediate; and Buyers agree to make reasonable and timely efforts to remediate before termination." PSA at 2. Such alternative dispute resolution provisions, while found in many types of contracts, are commonly found in employment contracts. 4 Am. Jur.2dAlternative Dispute Resolution § 55 (1995) at 116; see also 48A Am. Jur.2d Labor and Labor Relations § 3389 (1994) at 547 ("dispute over a change in the method of computing incentive pay was arbitrable under an [employment] contract requiring the arbitration of `any dispute'").
Significantly, this Court also recognizes that a partnership income tax return for Homeowners for fiscal year 1998 (the "Partnership Tax Return") was entered into evidence, naming the defendants, and not the plaintiff, as the sole partners with respect to Homeowners. Plaintiff's Exhibit 40;see Southex 279 F.3d at 100 (citing Cochran, 85 Cal.App.3d at 82 (failure to file partnership tax return probative of non-partner relationship)). Similarly, appended to the Partnership Tax Return was an IRS form 1099-MISC (the "1099-MISC"), indicating that Homeowners had compensated the plaintiff as an independent contractor for taxable year 1998. Plaintiff presented no evidence to suggest that he ever protested to the defendants these tax return classifications. Finally, portions of the plaintiff's trial testimony cast further doubt on whether the parties intended a partnership. For example, when questioned by Natalizia with regard to whether the PSA precluded the defendants from changing Homeowners's remittance address and/or re-locating Homeowners's physical location to that of Sprague, the plaintiff replied "It's not [in the PSA]." Tr. of April 22 and 23, 2003 at 45. Asked why he believed a partnership existed, since it was not provided for in the PSA, the Plaintiff testified that during his preliminary negotiations with Natalizia he (the plaintiff) had indicated his desire to form a partnership. Specifically, he stated that "talking about the specifics of a partnership, that was done verbally on the phone, what I expected, how I expected it to be done. . . ." Tr. of April 10 and 11 at 26. When asked about the lack of any reference to a partnership in the PSA, the plaintiff suggested that Natalizia actively discouraged him (the plaintiff) from retaining counsel to draft a partnership agreement and this was why the terms of the PSA did not reflect his true intentions.Tr. of April 22 and 23, 2003 at 50-51. Nevertheless, when asked "did anything stop you from saying, `Let me hold off on signing. Let me not take the check. Let me have this reviewed by an attorney?'" the plaintiff tersely replied, "No, nothing stopped me." Id. at 53. While the evidence at trial suggested that Natalizia, with whom the plaintiff principally negotiated, had an educational background somewhat superior to that of the plaintiff[4], this Court is also mindful that, prior to the execution of the PSA, the plaintiff had operated Homeowners and NEFSBO for several years. See generally Tr. of April 10 and 11, 2003. The defendants, alternatively, professed no similar experience. Id. Accordingly, with respect to the sophistication of the parties, it cannot be said that the plaintiff was of such unequal bargaining power as compared to the defendants so as to have made the PSA per se unconscionable. See generally Holliston Mills, Inc., v. Citizens TrustCo., 604 A.2d 331 (R.I. 1992) (noting that courts are mindful of the respective bargaining power of the parties to a contract when examining its provisions).
Plaintiff also cannot rely upon an accepted maxim of contract law which holds that ambiguities in a contract should be narrowly construed against its drafter, as a well-recognized exception posits that when such a document is the product of mutual contributions in an arms-length transaction, the Court may give that writing's terms a more expansive construction. 59A Am. Jur.2d Partnership § 123 at 302; Rhode IslandDepositors Insurance Protection Corp., 821 A.2d at 222. Here, Natalizia's un-controverted recollection indicated that he had "specifically [been] asked to put [in the PSA] something with respect to termination procedures and some protections with regard to that [by the plaintiff]."Tr. of April 22 and 23, 2003 at 101. This Court, charged in a bench trial with the task of assessing witness credibility, finds the testimony of Natalizia on this point credible and persuasive. Bruce v. Weekly WorldNews, Inc., 310 F.3d 25 (1st Cir. 2002). (court sitting, "qua
factfinder, was entitled to make the crucial credibility determination as between the competing expert witnesses"). As plaintiff made contributions to the specific terms and conditions of the PSA, any contract ambiguities cannot inure to the benefit of the plaintiff.
Ultimately, the party asserting the existence of a partnership has the burden of persuasion, and such showings must be made by a preponderance of the evidence. Southex, 279 F.3d at 99 n. 5. Considering the totality-of-the-circumstances with respect to the creation and drafting of the PSA and the parties' subsequent words and conduct, this Court is not persuaded that the plaintiff has met his trial burden and, therefore, finds the plaintiff has not shown the existence of a partnership with the defendants. As such, he is entitled to no recovery or relief on his claims.
 LOST PROFITS
In their counter-claim, the defendants have alleged that the plaintiff's abrupt work stoppage on or about November, 1998 constituted a breach of contract and resulted in lost profits to NEFSBO and Homeowners. Specifically, the defendants aver that because they were unskilled in the marketing of NEFSBO, a skill solely within the ken of the plaintiff, they were unable to properly circulate the Magazine and, consequently, lost large sums of revenue.
It is generally well-accepted that "[d]amages for lost profits are recoverable only when proof is made with `sufficient certainty.'" Augat,Inc. v. Aegis, Inc, 417 Mass. 484, 488, 631 N.E.2d 995, 997-998 (quotingJet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 181, 385 N.E.2d 1349
(1979)). "[C]ourts consider various factors and use a variety of methods to prove lost profits." 24 Samuel Williston, Williston on Contracts
§ 64:11 at 108 (Richard A. Lord ed., 4th ed. 2002). Thus, at least one court has held evidence of such "relevant factors in determining the value of a chance for obtaining business . . . to include: the total amount of business that the nonbreaching party would have been eligible for; any material facts that would have tended to prevent the party from receiving his or her proportionate share of such business; and the average expenses in fulfilling the obligations of the contract." Id. (citing Ace-Federal Reporters, Inc. v. Barram, 226 F.3d 1329 (Fed. Cir. 2000)).
In the present matter, even assuming, arguendo, that there was an enforceable contract between the parties, the defendants have not provided this Court with the requisite proof so as to sustain their counter-claim for damages. Essentially, the defendants have not indicated to a sufficient degree what projected damages they lost, even if they were to prove that the plaintiff breached a contractual duty to them. Accordingly, the defendants' claim for damages due to lost profits must also be denied.
 CONCLUSION
The plaintiff has not demonstrated by a preponderance of the evidence that the PSA, even when read in the light of the parties' subsequent words and conduct, created a partnership. Accordingly, this Court denies the plaintiff's claims as to breaches of contract and breaches of fiduciary duties and, likewise, denies his request for an accounting of NEFSBO's and Homeowner's profits. This Court also denies the defendants' counter-claim for lost profits.
Counsel shall submit the appropriate order for entry.
[1] In the conduct of his business, the plaintiff also went by the name of Dennis Pace.
[2] A patent ambiguity has been defined as "[a]n ambiguity that clearly appears on the face of a document, arising from the language itself. . . ." Bublitz v. E.I. duPont de Nemours and Co.,171 F. Supp.2d 906, 911 (S.D.Iowa 2001) (quotingBlack's Law Dictionary (7th ed)).
[3] G.L. 1956 § 6-1-1 provides that:
 "No person or persons shall carry on or conduct or transact business in this state under any assumed name, or under any designation, name, or style, corporate or otherwise, other than the real name or names of the individual or individuals conducting or transacting business, unless the person or persons shall file, in the office of the town or city clerk in the town or city in which the person or persons conduct or transact, or intend to conduct or transact, business, a certificate stating the name under which the business is, or is to be, conducted or transacted, and the true or real full name or names, both the first name and surname, of the person or persons conducting or transacting the business, with the post office address or addresses of the person or persons. The certificate shall be executed and sworn to by the person or persons so conducting or intending to conduct the business, before some person authorized to administer oaths." G.L. 1956 § 6-1-1.
[4] Natalizia testified that he had "a Master's Degree on Business, which includes several courses in finance, and I've taught finance at Bryant College on a part-time basis on and off for several years." Tr. ofApril 22 and 23, 2003 at 88-89.