DECISION
Before this Court is a motion to approve the Receiver's Final Report and First and Final Application for Compensation. The Receiver was appointed in order to liquidate two parcels of land in Warren, Rhode Island and Hopkinton, Rhode Island, to ascertain the various claims and interests in the land, and to satisfy those claims and interests. (Ord. Appt'ing Permanent Receiver ¶¶ 1, 3, 4, 9.) This decision concerns only the Hopkinton parcel, which the Receiver sold at a Court-supervised sale for approximately $565,000. Following the payment of various liens and security interests in the property, there remained approximately $186,500 in the receivership estate. After accounting for the fees of the receivership, the Receiver held $139,000 for the receivership estate (surplus proceeds) and sought guidance from the Court as to its disposition. The Court approved the Receiver's Final Report, awarded him the fees and expenses of the receivership, and discharged the Receiver.
The surplus proceeds are now being held in escrow and the sole issue before the Court is to whom those funds should be distributed. Anthony Armao (Armao) has made a claim to the surplus proceeds on the basis of an agreement between him and Karen A. Alegria (Karen) to sell the Hopkinton parcel to Karen in October 2003. Karen objects to this claim and argues that she should receive the surplus proceeds on the basis of her ownership of the parcel when the receiver was appointed. The Court has jurisdiction pursuant to G.L. 1956 § 8-2-14.
 Facts/Travel
Karen acquired the Hopkinton parcel in October 2003 from Armao. On October 8, 2003, the parties executed a document entitled "Agreement for the Sale of Property." (Pl's Ex. 7 at 3.) Under that agreement, Armao agreed to convey the property to Karen via warranty deed. Id. ¶ 1-2. In exchange for the property, Armao would receive $200,000 at closing and $30,000 for each buildable lot that was sold — presumably as a result of a contemplated subdivision of the property.[1] Id. ¶ 1. In addition, as "additional terms," that agreement provided that Armao would have his choice of two buildable lots "when final approval and building permit can be issued." Id. ¶ 8. Further, the $30,000 payment term was to survive the execution of the warranty deed, was not to merge with the deed, and was to remain in effect until a future agreement superseded the October 8 agreement. Id.
The sale was scheduled to close on October 14 or 15, 2003.Id. ¶ 2. It appears that the sale closed on or near the scheduled closing date. Following the closing, the October 8 agreement was superseded by an agreement dated October 21, 2003. (Pl's Ex. 12 at 1.) That agreement reiterated that Armao would be entitled to select any two lots for himself following the subdivision, and that he was entitled to $30,000 per lot sold.Id. at 2. It also provided that "the within parties agree that" the Hopkinton parcel was "to be subsequently sub-divided into no less than four (4) and no more than twenty three (23) buildable lots." Id. at 1. The agreement memorialized by these two documents will be collectively referred to as the 2003 Agreement.
Although Karen Alegria was the transferee of the Hopkinton parcel, it appears that Richard M. Alegria (Richard), her father, had a significant level of involvement with the transaction before and after the closing. Armao testified in his deposition that he dealt primarily with Richard while negotiating the proposed sale, though it was understood by all involved that the property would be held in Karen's name. (Armao Deposition 9:23-15:5, 20:23-21:25, May 1, 2006). Further, according to the minutes of the November 5, 2003 meeting of the Hopkinton Planning Board, it was Richard who applied for an "informal advisory opinion" on a proposed 23 lot subdivision of the Hopkinton parcel. (Pl's Ex. 13, at 2.) Those minutes also note that the "applicant does not have the road frontage required by the Town and does not embrace conservation design philosophy." Id. The parcel was never subdivided during the time between the sale to Karen and the appointment of a receiver.
In early 2005, the mortgage(s) were in default, and foreclosure was threatened. Karen petitioned the Court to appoint a receiver to liquidate the property, and the Court appointed the permanent Receiver on February 18, 2005. (Ord. Appt'ing Permanent Receiver, Feb. 18, 2005). The Receiver sought permission from this Court to sell the property, and a hearing was held on August 31, 2005. (Ord. Grant. Receiver's Mot. to Sell, Sep. 8, 2005.) At the hearing, the Receiver stated that he expected the sale to result in substantial surplus proceeds after all secured claims were paid. Id. ¶ 6. At the hearing, Armao asserted that he had a secured claim on the basis of the 2003 Agreement with Karen, and objected to the sale of the property. Id. ¶ 4. He also argued that he was entitled to the surplus proceeds. Id. ¶ 6. However, the Court found that the documents were not security instruments, and therefore Armao had no secured claim on the property. Seeid. ¶¶ 4, 6. The Court entered an order granting permission to sell the property and shortly thereafter, the Receiver did sell the property.[2] Id. ¶ 1. In that order, the Court also directed the Receiver to issue a notice to interested parties and creditors directing them to show cause why the surplus proceeds should not be paid to Armao. See id. ¶ 6, 7. Karen responded to the show cause order and argued that she was entitled to the surplus proceeds as the record owner of the Hopkinton parcel prior to the receivership.
 Analysis
Armao has advanced various arguments as to why he is entitled to the surplus proceeds. The Court has already found that the 2003 Agreement with Karen does not evidence a security interest in the Hopkinton property, and will not revisit that ruling here.See id. ¶ 4. In addition, Armao argues that both Karen and he are unsecured creditors with claims on the receivership estate, that Karen is an "insider," and therefore her claim should be equitably subordinated to his claim. His second argument is that he has a claim against Karen for breach of contract arising from the 2003 Agreement. Finally, he argues that the arrangement among Karen, Richard, and Armao constituted a partnership, and that he is entitled to the surplus proceeds as a return of the capital he contributed to the purported partnership.
The Court will treat the first two arguments together. Armao asserts that Karen has breached the 2003 Agreement because she failed to subdivide the Hopkinton parcel into between four and twenty-three lots.[3] As a result, Armao neither received the payment of $30,000 per lot, nor received his choice of two of lots, as provided by the Agreement. Therefore, he argues that he is entitled to damages, and that because his damages exceed the surplus proceeds, he is entitled to all of the surplus proceeds.
Armao's arguments must fail because they are based on the presumption that he has a claim against the receivership estate. Through her counsel, Karen properly points out that this proceeding is a receivership in land, not a receivership of Karen Alegria or her assets. See Ord. App'ting Permanent Receiver ¶¶ 1, 3. The estate consists only of the proceeds of the land sale. Only claims or interests in the Hopkinton parcel, and not against Karen in general, are properly asserted in this receivership.Id. ¶ 9. Therefore, assuming arguendo that Armao does have a valid claim against Karen, that claim is of a contractual nature and not a claim or interest in the Hopkinton parcel. Since it appears that all other claims or interests in the land have been satisfied, Karen would still be entitled to the surplus proceeds in spite of the existence or amount of such a claim.[4]
Armao may have recourse against Karen for breach of the 2003 Agreement, but he is not entitled to the proceeds of the land sale in this receivership proceeding.[5] Since the Court finds that Armao does not have any claim to the receivership estate on this basis, there is no need to address the equitable subordination argument.
Armao's last argument is that the arrangement among Richard, Karen, and him amounted to a partnership in the business of subdividing and selling land. He argues that the filing of the receivership petition dissolved that partnership and, therefore, he is entitled to the surplus proceeds as a return of capital — i.e. the land — that he contributed to the partnership. While he received $200,000 in cash for the land, he argues that the land's value in 2003 exceeded $500,000, so that he contributed $300,000 of capital to the partnership. Therefore, he is entitled to all of the surplus proceeds, which by his calculation would still not even make him whole.
The Court notes as an aside that Armao's position — that he and the Alegrias had a partnership — was first raised in his third memorandum relating to the surplus proceeds, (Armao's Mem. On the Subj. of Claims 7, Sep. 1, 2006) ("the relationship between the Alegria's and Armao amounted to a partnership"), and directly contradicts statements made in his earlier memoranda, (Armao's Position Concerning Distribution of the "Excess Proceeds" 2-5, Aug. 7, 2006) ("[Karen], in effect, argues that the parties had a joint venture that failed. . . . This agreement is not, as [Karen] has suggested, a joint venture agreement . . . Here, Armao was not required to do anything.") In spite of this apparent contradiction, the Court will address the partnership argument.[6]
The Court agrees that if there was any partnership to subdivide and sell the Hopkinton parcel, it was dissolved when the receivership petition was filed, if not sooner. See G.L. 1956 §7-12-40.[7] The Court also agrees that, if there was a partnership to subdivide and market the land, then the land was partnership property subject to the rules for distributing partnership property. See § 7-12-19 (implying that real property owned by the partnership may still be held in the name of an individual partner). Finally, the Court agrees that any loans or capital contributions to a partnership must be repaid prior to the distribution of any profits to partners. See §7-12-51 (providing that upon dissolution, liabilities to creditors of the partnership must be settled first, then liabilities to partners other than for capital and profits, then returns of capital, and then finally profits). Thus, if the Court finds that a partnership existed, and that Armao's claim constitutes the repayment of a loan or capital contribution, then he would be entitled to the surplus proceeds as partnership property to which he is entitled.
Because there is a dearth of Rhode Island case law on whether or not a partnership exists, the Court will look to other interpretations of the Uniform Partnership Act on which the Rhode Island act is based. Southex Exhibitions, Inc. v. R.I. BuildersAss'n, 279 F.3d 94, 98 (1st Cir. 2002) (citing § 7-12-15(d), which provides that §§ 7-12-17 to 7-12-55 should be construed as to "make uniform the law of those states" which have enacted those sections).
A preliminary question is the standard of review under which this Court should decide whether a partnership exists. See
Bromberg, Partnership § 2.03(a) at 2:34. The burden is generally on the party asserting the existence of a partnership, subject to certain statutory presumptions described infra.Id. § 2.03(b) at 2:26. Courts are split, however, as to whether clear and convincing evidence, or merely a preponderance of the evidence, must be shown to establish a partnership. Id. § 2.03(b) at 2:26-27.
In the current procedural setting — whether to approve the receiver's disallowance of Armao's claim — the Court is mindful that it has not yet heard evidence specifically addressed at determining the existence of a partnership. Whether a partnership exists is often a highly fact-intensive inquiry because a partnership can be created without formalities. Id. § 2.01(a) at 2:5. Although the standard form of a partnership involves the equal sharing of profits and losses, this rule can be modified by agreement of the partners, so a partnership may not be readily apparent. However, the Court finds that it may render a decision on the basis of the record before it without any further evidentiary proceedings and regardless of the evidentiary standard to be applied. As described below, the result would be the same under either evidentiary standard and is unlikely to be changed by further evidentiary proceedings.
A partnership is defined as "an association of two (2) or more persons to carry on as co-owners a business for profit." Sec.7-12-17. There are certain statutory presumptions for determining whether a partnership exists. Specifically, the receipt of profits creates a presumption of partnership under § 7-12-18(4), which is modeled after the Uniform Partnership Act § 7(4). See
Bromberg, Partnership § 2.08 at 2:221.4 to .5. However, where profits are received pursuant to a "protected relationship," the proponent of partnership is not entitled to an inference of partnership. Id. Where a protected relationship exists, "the proponent of partnership must present evidence of partnership other than profit-sharing to survive a motion for directed verdict or similar motion." Id. § 2.08(d) at 2:114.
There is a protected relationship in the case at bar. No inference of partnership "is drawn if profits were received in payment . . . [a]s the consideration for the sale of a good will of a business or other property by installments or otherwise." Sec. 7-12-18(4)(v) (emphasis added). The payments to which Armao is arguably entitled under the 2003 Agreement were in consideration of his transferring the Hopkinton parcel, so even if the payments could arguably be described as profits, he still would not be entitled to a presumption. It is commonplace for transactions to include a payment which is derived from profits, but not all such transactions create a partnership. See
Bromberg, Partnership § 2.07(b) at 2:86.
Even though Armao is not entitled to a statutory presumption of partnership, a partnership may still have existed, so the Court will look to the factors which have guided courts in determining whether the parties intend to be co-owners of a business. In order to determine the existence of a partnership, Courts look to 1) the parties' intent, 2) whether the partnership activity is a "business," 3) whether the parties intended to carry on as co-owners, and 4) whether the activity is for profit. Id. § 2.01(a) at 2:6. The second and fourth factors are consistent with partnership because a business is broadly defined as every trade, occupation, or profession, and clearly some profit was intended from the venture. Sec. 7-12-13(2); see Bromberg, Partnership
§ 2.06 at 2:74-78. The intent and co-ownership factors are not so clear, however.
The intent factor involves both subjective and objective elements.[8] Bromberg, Partnership § 2.05(a) at 2:42-43. The Court finds very little expression of subjective intent by either party, prior to litigation, to create a partnership.[9] However, while the 2003 Agreement does not specifically use the words partner or partnership, such silence is not entirely conclusive on the intent issue.[10] A partnership can be found even if the purported partners do not subjectively believe themselves to be partners and do not refer to themselves as partners. Id. § 2.01(a) at 2:5. The Court must also examine objective indicia of intent to form a relationship that legally amounts to partnership. Id. § 2.05(c) at 2:62. Those factors include attributes of co-ownership such as profit and loss sharing, control, and capital contributions. Id. § 2.05(c) at 2:64.
The most important factor that courts examine is the sharing of profits. Id. § 2.07(a) at 2:79.[11] Profit-sharing is important because those who share in profits — who have claims to the assets of a firm only after debts are paid — "have the most to gain from the success of the business and the most to lose from its failure." Id. § 2.07(b) at 2:83. Such an incentive is commonly associated with ownership of a business because those profit-sharers have incentives to monitor the business. Seeid. However, as noted above, mere profit-sharing alone appears to be insufficient to find partnership where there is a protected relationship. Id. § 2.08(d) at 2:114. Because there was a protected relationship in the case at bar, Armao must show more than merely an expectation of profit sharing.
The Court finds that Armao has not shown a profit sharing arrangement. A partner's entitlement to profits is an expectation that he will be paid last, after other claimants with fixed entitlements are paid. Id. § 2.07(b) at 2:83. The 2003 Agreement provided that in exchange for providing the land, Armao would receive $200,000 up front, his choice of two lots to own when the subdivision was complete, plus a $30,000 payment for every lot sold. His return from the venture would have little relationship to its overall success: regardless of the eventual sale price of a given lot, and regardless of the costs of subdividing the land, his return was fixed at $200,000, $30,000 per lot sold, and two lots. So, hypothetically, even if the subdivided lots eventually sold for less than $30,000 apiece, the 2003 Agreement would still entitle him to $30,000 per lot. It is Karen who bore most of the risk of fluctuations in the value of the individual lots, as well as the expense of subdividing them. Therefore it is Karen, and not Armao, who had the most incentive to monitor the overall success of the business and maximize its profitability. Although Armao did bear the risk of fluctuations in the value of his two lots, whose return could be described as profits if and when he sold them, his return is in large part a fixed claim, not a residual claim to the profits of the venture. Therefore, the Court finds that Armao has not shown a profit-sharing arrangement, but even if these payments are profits; however, Armao must show more to demonstrate that a partnership existed.
Sharing of losses is another important element that courts examine because it involves "the kind of substantial participation in the risks of the enterprise that is characteristic of co-ownership." Id. § 2.07(d)(1) at 2:104. In a standard partnership, unless modified by agreement, the partners bear any losses incurred by the partnership in proportion to their profit share. Id. at 2:104-05. Though a contract that eliminates loss sharing does not in itself negate the existence of a partnership, it does weigh heavily against one. Id. In this case, the manner in which the parties share the risk of losses could be consistent with a partnership arrangement, but is more consistent with an arms-length land sale transaction. Although it was Armao's capital that was arguably at risk — if one accepts his argument that the 2003 land value exceeded the $200,000 he received — he would incur no costs of developing the subdivision such as permit fees and fees for engineers, planners, realtors, and attorneys. As noted above, he bears little risk if the lots do not produce a high return: he still claims an entitlement to $30,000 per lot. While he runs the risk that he will not be paid, every creditor bears that risk. Therefore, while this allocation of loss could be consistent with a partnership, the Court finds that this is not a loss sharing arrangement.
Courts also examine the extent to which parties exert control in the management of the business in determining co-ownership.Id. § 2.07(c) at 2:95-103. In a standard partnership, all partners have an equal right to control important business decisions. It is abundantly clear from Armao's deposition, which his counsel provided to the Court with his memoranda, that Armao intended to have no control over the manner in which the subdivision was obtained or in which the lots were sold:
 "Q. Who was responsible for subdividing the property?
 A. The Alegrias.
 . . . .
 Q. So Richard had nothing to do with subdividing this property?
 A. Oh, no, Richard was like, I mean, I guess he was the spokesman for them. At times he was the one that I had most of the conversations with, but it was a known fact that I was selling the property to Karen Alegria and she basically was the one that was subdividing the property." (Armao Deposition 34:24-25, 35:18-25, May 1, 2006).
 "Q. Is there any written agreement that you know of that says who is responsible for developing and subdividing the property, other than what we've looked at so far today?
 A. I wouldn't think that would be a concern of mine to even have that information." Id. at 39:7-12.
 "Q. So [Richard] was going to be doing the development?
 A. Whatever he did, I don't know what he did and what she did. So I'm not, I'm in Florida, they're, you know, here in Bristol, so I don't know who's doing what." Id. at 40:15-19.
When the examiner asked Armao why he did not structure the land sale in a different manner, he reiterated that he was to have no responsibility for the expense of subdividing and developing the property.
 "Q. . . . who was going to bear the expense of developing and subdividing the property.
 A. I have no idea.
 Q. You weren't.
 A. No, no, no, no.
 . . . .
 Q. So why was it structured that way?
 A. Because I'm not a developer for one thing, I'm in Florida, I'm not up here, so I, you know, I felt that this was the way it would work out best is by me just sittin' back and gettin' the thirty thousand dollars as every house was sold and in the beginning I would be able to pick my two house lots." Id. at 42:16-20, 43:14-21 (emphasis added).
Finally, Armao testified at his deposition that he did not even learn that the subdivision was not approved until the day of his deposition on May 1, 2006. Id. at 52:7-23. Armao's characterization of the arrangement is not that of a co-owner of a business. See § 7-12-17. The Court finds that Armao's lack of control over the purported partnership weighs conclusively against the finding of a partnership.
Finally, the last two factors that courts examine are co-ownership of property and contributions to capital. Bromberg,Partnership § 2.07(e)-(f). Here, the property was conveyed by Armao to Karen, not by Armao to a partnership.[12] There appear to have been no separate partnership books, tax returns, or accounts. Further, while Armao alleges that the land was a contribution to capital, he received consideration for that capital. This further indicates that the parties did not carry on as co-owners, and that the contemplated transaction was merely a sale of property. See § 7-12-17.
Because the 2003 Agreement exhibited no subjective intent by the parties to form a partnership, because the Court finds that there is no sharing of profits or of losses, and because Armao was to exert little control over the subdivision of the land, the Court finds that no partnership existed. There are little grounds for finding a partnership — under any evidentiary standard — beyond the fact that Armao arguably contributed capital and was entitled to payments that arguably could be described as profits. Therefore, the Court finds that these payments were merely consideration for the sale of land, which may give Armao the status of a creditor of Karen but not a partner. Because the Court finds that there was no partnership, the Court need not determine whether the transfer of the land constituted a contribution of capital to the partnership, or the value of any such contribution.
 Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court denies Armao's claim to the surplus proceeds of the receivership estate and will order that those funds be paid to Karen Alegria as the record owner of the Hopkinton parcel when the Receiver was appointed. Counsel for Karen Alegria may present an order consistent herewith to the Court after due notice.
[1] The $200,000 was obtained via loan in exchange for a mortgage on the property. The Receiver has satisifed that loan and all other indebtedness secured by the property, except for any claim that Armao may have. See Receiver's Final Report, App. B.
[2] Armao appealed the order. The Supreme Court found that, since the land had already been sold, the appeal had become moot to the extent that it challenged the sale. (Order, Alegria v. One Lot of Land, No. 06-39-A (R.I. April 14, 2006)). However, that dismissal was without prejudice to Armao's right to assert a subsequent appeal from any final order of this Court which disposed of the surplus proceeds. Id.
[3] Karen denies that she was under any obligation to subdivide the land under the 2003 Agreement. She contends that any obligation to Armao was conditional upon subdivision of the land, but that since the land was never subdivided, she has no obligation to Armao.
[4] The Court expresses no opinion as to whether Armao may be able to attach Karen's interest in the receivership estate pursuant to any claim he may assert against her in another proceeding.
[5] There are many ways that Armao could have structured the 2003 transaction in order to avoid the unfortunate situation in which he now finds himself. For example, he could have kept the land in his name while it was subdivided, or he could have taken back a mortgage of the property following the conveyance to Karen.
[6] A partnership and a joint venture differ in that a joint venture is a single transaction, while a partnership is a series of transactions directed toward an end. Id. See Alan R. Bromberg and Larry E. Ribstein, Partnership § 2.06(a) at 2:74.1 n. 3 (2006-2 Supp.) (Bromberg, Partnership). However, it appears that partnership law applies to joint ventures for most purposes, and Armao does not appear to distinguish between the two types of business relationship. See id.
[7] "The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." § 7-12-40.
[8] "Whether the parties are co-owners depends fundamentally on their intent." Bromberg, Partnership § 2.07(a) at 2:78. Intent can be either objective or subjective: "[b]ecause every case involves the question of whether a particular consequence of partnership should be imposed on an unwilling party, intention is never entirely subjective." Id. at 2:78-2:79.
[9] For example, no written agreement appears to exist which refers to the parties as partners; no joint accounts were kept; and no partnership tax returns were filed. See Bromberg,Partnership § 2.05(b) at 2:47-54.
[10] As between the purported partners, subjective intent carries more weight than it would carry in a dispute involving the rights of third-parties to the partnership. See Bromberg,Partnership § 2.05(c) at 2:68-70.
[11] While a business need not actually be profitable, there must be an expectation that profits will be received. Id. § 2.06(c) at 2:78.
[12] See § 7-12-19 (providing that property may be held in the name of a partnership).