NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**DENNIS R. DEVONA,**

*Plaintiff/Counterclaim Defendant-Appellant*

**v.**

**STEVEN M. ZEITELS,**

*Defendant/Counterclaimant-Appellee*

**ENDOCRAFT LLC,**

*Counterclaimant-Appellee*

---

2018-1210

---

Appeal from the United States District Court for the District of Massachusetts in No. 1:13-cv-10952-IT, Judge Indira Talwani.

---

Decided: March 18, 2019

---

DAVID ALAN WOLLIN, Hinckley, Allen & Snyder LLP, Providence, RI, argued for plaintiff/counterclaim defendant-appellant. Also represented by RYAN M. GAINOR, CRAIG M. SCOTT.

KEVIN PAUL MARTIN, Goodwin Procter LLP, Boston, MA, argued for defendant/counterclaimant-appellee and

counterclaimant-appellee.   Also represented by JOSHUA JAMES BONE, ANDREA SCRIPA.

––––––––––––––––––––

Before PROST, *Chief Judge,* CLEVENGER and MOORE, *Circuit Judges.*

Opinion for the court filed by *Chief Judge* PROST.

Dissenting opinion filed by *Circuit Judge* CLEVENGER.

PROST, *Chief Judge*.

Plaintiff-appellant Mr. Dennis DeVona sued Defendant-appellee Dr. Steven Zeitels for breach of an alleged partnership agreement and breach of fiduciary duty.   At trial, the jury returned a verdict in Mr. DeVona's favor.   After reviewing the evidence presented at trial, however, the U.S. District Court for the District of Massachusetts granted Dr. Zeitels's motion for judgment as a matter of law ("JMOL").   The district court determined that no reasonable jury could have found that a continuing partnership existed after May 1999.   Mr. DeVona appeals.   We affirm.

BACKGROUND

I

Mr. DeVona is a craftsman and art appraiser.   Dr. Zeitels is a throat surgeon who specializes in treating throat cancers.

In 1994, Dr. Zeitels informed Mr. DeVona that he was designing a new glottiscope, which is a medical instrument for laryngeal surgery.   He offered to let Mr. DeVona "quarterback" the project since Dr. Zeitels did not have the time or experience to get involved with manufacturing the instrument.   J.A. 236–37.   Mr. DeVona was not interested.

In 1997, however, Mr. DeVona and Dr. Zeitels resumed their discussions.   The two met at Dr. Zeitels's house in

Boston, where Dr. Zeitels showed Mr. DeVona various medical instruments and demonstrated the progress he had made in the glottiscope design.

At a second meeting, the parties agreed to work with one another. The nature of their small-scale undertaking was clear. After the design was finalized, they would develop a prototype. Subsequently, they would have the product manufactured, prove its marketability, and sell the company and/or the intellectual property to a larger-scale producer as soon as possible. J.A. 413–14; J.A. 245. According to Mr. DeVona, the purpose of this joint business endeavor was "to develop a surgical instrument or surgical instruments" and "sell the intellectual property to the highest bidder as soon as [they] could." J.A. 245. Dr. Zeitels "would put up the money," Mr. DeVona "would put up the energy and work it would take," and they would "try and knock it out in 12 months." *Id.* Dr. Zeitels and Mr. DeVona agreed to split the profits 60%–40% respectively. *Id.*

In 1998, Dr. Zeitels and Mr. DeVona moved forward with their new undertaking. They opened a joint bank account, which Dr. Zeitels funded. By early 1999, Dr. Zeitels and Mr. DeVona had developed a prototype to offer to a medical device manufacturer for production.

In April 1999, Dr. Zeitels and Mr. DeVona met with a manufacturing company, ACT Medical, in Boston. At the meeting, the parties evaluated whether it was feasible to hire ACT Medical as a subcontractor to manufacture the glottiscope. After ACT Medical quoted a price of $600,000 to make the first hundred devices, Dr. Zeitels and Mr. DeVona concluded that a subcontractor "was too expensive to go with." J.A. 331.

## II

At that point, Dr. Zeitels and Mr. DeVona decided to "switch gears." J.A. 414 (DeVona Testimony). According to Mr. DeVona, "We thought we could sell the company

early. And when we went to ACT Medical a month earlier, we realized it was a no-go just to have it made and just sell the company." *Id.*

As a result, the parties completely restructured their relationship in the spring of 1999. About a week after the ACT Medical meeting, the company Endocraft was formed. Dr. Zeitels created the company and put up the money to fund it. Dr. Zeitels owned Endocraft. J.A. 1187 (Endocraft Action Form). The parties closed their old joint bank account and opened a new Endocraft account. In an application for a $20,000 credit card for the new company, Dr. Zeitels was listed as the 100% owner of Endocraft. Mr. DeVona's ownership stake was listed as 0%.

Dr. Zeitels also presented Mr. DeVona with an "Independent Sales Representative Agreement" ("ISRA"). J.A. 338 (DeVona Testimony); J.A. 1192–98 (ISRA). Per that agreement, Mr. DeVona was to become a "Sales Representative to sell the products of [Endocraft]," employed on an "at will" basis. J.A. 1192 (¶¶ 1, 5). For his work, Mr. DeVona was to receive a commission of 40% of net sales after deductions for research and development costs. J.A. 1193 (¶ 6(a)). The fully-integrated agreement stated: "Nothing contained in this Agreement shall be construed to constitute the Sales Representative as a partner, employee, or agent of [Endocraft]." J.A. 1196 (¶ 12). Mr. DeVona expressed some concerns about the agreement but ultimately signed it. J.A. 1197.

As of May 1999, Endocraft was the "vehicle for [their] relationship." J.A. 494 (DeVona Testimony). Similarly, Mr. DeVona testified that the ISRA was "a vehicle for our overall vision and plan as partners." J.A. 553. The ISRA explicitly disclaimed that Mr. DeVona had any stake in Endocraft.

Eventually, the relationship between the parties became strained. J.A. 536; J.A. 356. In 2011, Dr. Zeitels ended Mr. DeVona's employment and sold Endocraft.

### III

On April 17, 2013, Mr. DeVona filed a complaint in the District of Massachusetts. The complaint raised a correction of inventorship claim under 35 U.S.C. § 256, as well as an unjust enrichment claim based on Dr. Zeitels's alleged misuse of intellectual property belonging to Mr. DeVona. In addition, the complaint pled three partnership-related claims: (1) violation of the Rhode Island Uniform Partnership Act; (2) breach of fiduciary duty; and (3) breach of a partnership agreement. For each partnership claim, Mr. DeVona's allegations assumed that the parties had been in a continuous partnership from 1997 through 2011. Mr. DeVona alleged that he was not an Endocraft employee but instead Dr. Zeitels's partner. Thus, regardless of his commission of 40% of Endocraft's net sales, Mr. DeVona averred that he was entitled to a partnership share of 40% of the profits from selling Endocraft.

The parties went to trial on the patent inventorship claim and partnership claims. The jury found against Mr. DeVona on patent inventorship, rejecting his theory that he meaningfully contributed to the glottiscope design embodied by U.S. Patent No. 6,955,645. Thus, Dr. Zeitels remains the only inventor listed on the patent. However, the jury found in Mr. DeVona's favor on the partnership claims. For breach of fiduciary duty, the jury awarded $395,907. For breach of the partnership agreement, the jury awarded Mr. DeVona $352,007.

Both parties filed post-trial motions. Reviewing the record evidence, the district court granted Dr. Zeitels's motion for JMOL. The district court concluded that while the jury may have had a basis in the record to find that the parties initially entered into a partnership in 1997 for the purpose of developing a product and quickly selling the business to a third-party producer, "any such partnership dissolved under Rhode Island law once [Mr.] DeVona and [Dr.] Zeitels abandoned that initial undertaking after the

meeting with ACT Medical to embark instead on a new tact of actually manufacturing instruments and selling them on a long term basis." J.A. 7. The district court also conditionally granted Dr. Zeitels's new trial motion, concluding that the jury's verdict of a partnership "after April or May 1999 is sufficiently contrary to the great weight of the trial evidence." J.A. 11 (discussing Fed. R. Civ. P. 50(c)(1) & 59).

Mr. DeVona appealed the JMOL decision as to the partnership claims. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

On appeal, Mr. DeVona mounts three challenges. First, he contends that the district court erred by concluding that there was insufficient evidence of a partnership after 1999. Second, he argues that the district court abused its discretion by excluding an email related to his claims that a partnership existed through 2011. Third, he avers that the district court erred by conditionally granting a new trial.

I

We apply the law of the regional circuit when reviewing district court rulings on post-judgment motions. *Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1331 (Fed. Cir. 2010). Under First Circuit law, the grant of a motion for JMOL is reviewed de novo. *Malone v. Lockheed Martin Corp.*, 610 F.3d 16, 19–20 (1st Cir. 2010).

JMOL is appropriate when "the facts and inferences" from the evidence introduced at trial "point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have returned the verdict." *Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 22 (1st Cir. 2010) (quoting *Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009)). A court considers "all of the evidence and reasonable inferences drawn from the evidence . . . in the light most favorable to the non-moving

party." *Cham v. Station Operators, Inc.*, 685 F.3d 87, 93 (1st Cir. 2012) (quoting *Malone*, 610 F.3d at 20). However, the non-movant "is not entitled to inferences based on speculation and conjecture." *Id.* (quoting *Vázquez–Valentín v. Santiago–Diaz*, 385 F.3d 23, 30 (1st Cir. 2004), rev'd on other grounds, 546 U.S. 1163, 126 S.Ct. 1329, 164 L.Ed.2d 43 (2006)). Rather, "to support a jury finding," the evidence presented must "make the existence of the fact to be inferred more probable than its nonexistence." *Irvine v. Murad Skin Research Labs., Inc.*, 194 F.3d 313, 317 (1st Cir. 1999) (quoting *Alvarez–Fonseca v. Pepsi Cola Bottling Co. of P.R.*, 152 F.3d 17, 24 (1st Cir. 1998)).

## II

Under the Rhode Island Uniform Partnership Act, a "partnership" is "an association of two (2) or more persons to carry on as co-owners a business for profit." R.I. Gen. Laws § 7–12–17(a). The statute enumerates certain rules for determining the existence of a partnership. *See id.* § 7–12–18. Most relevantly here, the statute provides that commonly owned property "does not of itself establish a partnership," the "sharing of gross returns does not of itself establish a partnership," and "receipt by a person of a share of the profits of a business is prima facie evidence that he or she is a partner in the business, but no such inference is drawn if profits were received in payment . . . [a]s wages of an employee." *Id.* § 7–12–18(2), (3), (4)(ii).

Given the "dearth" of cases interpreting this statute, however, "the Rhode Island legislature has counseled the courts to look to the interpretations which other states have given the Uniform Partnership Act (UPA), upon which section 7–12–18 is based." *Southex Exhibitions, Inc. v. R.I. Builders Ass'n.*, 279 F.3d 94, 98 n.2 (1st Cir. 2002). In addition, courts "frequently consider indicia of partnership formation not prescribed in the UPA." *Id.* at 101. The existence of a partnership "must be assessed under a 'totality-of-the-circumstances' test." *Id.* at 100.

In keeping with these principles, the jury was instructed to consider the following indicia to determine if a partnership existed:

1. whether the parties agreed to share in the profits of the business relationship,

2. whether the parties shared any losses of the business relationship,

3. the parties' respective contributions to the business relationship, whether monetary, labor or otherwise,

4. the parties' control over bank accounts or other assets, and if a joint bank account exists, whether that account is for convenience only or whether the party placing funds in that account intended to make such funds jointly owned,

5. whether the parties shared the management decisions of the business,

6. whether the partnership conducted business in its own name,

7. whether the business filed partnership tax returns, and

8. how Mr. DeVona and Dr. Zeitels held themselves out to third parties.

J.A. 1110 at ll. 2–17 (Jury Instructions). These factors are guideposts; no single indicia is conclusive. *Id.* at ll. 18–20.

### A

Neither party challenges the district court's conclusion that based on the criteria above, there is enough evidence for a reasonable jury to conclude that an initial partnership was formed verbally between Mr. DeVona and Dr. Zeitels in 1997. *See* Appellant's Br. 43; Appellee Br. 32–33. Instead, the parties dispute whether that partnership

dissolved in 1999. A partnership dissolves without violation of the agreement by "the termination" of the "particular undertaking specified in the agreement." R.I. Gen. Laws § 7–12–42(1)(i). Otherwise, if the partnership is not tied to a particular undertaking, the partnership may be dissolved by the express will of a partner. *Id.* § 7–12–42(1)(ii).

There is no dispute that to the extent a partnership formed in 1997 between Mr. DeVona and Dr. Zeitels, it was for a particular undertaking. The parties' dispute focuses only on the scope of that undertaking.

In Mr. DeVona's view, the district court characterized the particular undertaking too narrowly. The district court concluded a reasonable jury could find that Mr. DeVona and Dr. Zeitels formed "a partnership to create a company or a surgical device and to sell that device or company, or the intellectual property associated therewith, to the highest bidder in the shortest amount of time possible." J.A. 7. Based on the trial evidence, however, the court concluded that any partnership dissolved once Mr. DeVona and Dr. Zeitels abandoned that initial undertaking following the meeting with ACT Medical and started a new business "actually manufacturing instruments and selling them on a long term basis." *Id.*

Mr. DeVona contends the partners only ever had a single, consistent "shared goal" of eventually "selling a profitable business." Appellant's Br. 6, 13. According to Mr. DeVona, the broad undertaking never terminated, and thus the partnership never dissolved.

Mr. DeVona's attempt to take a single aspect of their original plan—"selling the business"—and read out his own clear testimony about the timing and nature of the undertaking is unavailing. When testifying at trial about the initial terms of the partnership, Mr. DeVona testified:

> Q. What was the nature of the work that the two of you agreed that you would do?
>
> A. It would be to develop a surgical instrument or surgical instruments, that we would sell the intellectual property to the highest bidder as soon as we could.

J.A. 245. Mr. DeVona further testified that the partnership was to "build a company," "build its assets," and "sell it as soon as we could, hopefully, in a year, and . . . [the] partnership wouldn't be over until we sold it and made the money." J.A. 360; *see also* J.A. 413–14 (explaining plan to get business sold "as soon as possible").

As a fundamental part of that undertaking, Mr. DeVona and Dr. Zeitels planned to secure a medical device manufacturer to make the product, allowing them to sell the company on a fast timeline. J.A. 245; J.A. 329–31. According to Mr. DeVona, he and Dr. Zeitels met with a medical device manufacturer, ACT Medical, but "we both learned that it was too expensive to go with a surgical instrument company making [the product] as a subcontractor." J.A. 331. He explained that after "they quoted us about $600,000 to make the first hundred, we decided that we might have to make it ourselves." *Id.*

Mr. DeVona testified that as a result of the meeting with ACT Medical, they "switched gears." J.A. 414. Mr. DeVona then summarized the status of their business: "We decided to switch gears. We thought we could sell the company early. And when we went to ACT Medical a month earlier, we realized it was a no-go just to have it made and just sell the company." *Id.*; *see also* J.A. 332 ("Q. What happened next after the meeting at ACT Medical? A. Well, we decided to make the instrument ourselves . . . .").

As the district court concluded, at best the evidence supports a finding that the parties formed a partnership for a "particular undertaking" in 1997, but that

undertaking terminated in 1999 when they switched gears to a much longer-term business of manufacturing the product.

B

Mr. DeVona next argues that if the original undertaking terminated in 1999, the partnership nonetheless continued after Endocraft was formed until it was eventually sold in 2011. The district court concluded that based on the record evidence, no reasonable jury could find that a partnership continued after Mr. DeVona and Dr. Zeitels decided to "switch gears" in 1999. J.A. 7. We agree.

If a partnership for a "fixed term" or "particular undertaking" is "continued after the termination" of such "term or particular undertaking without any express agreement, the rights and duties of the partners remain the same as they were at the termination, insofar as is consistent with a partnership at will." R.I. Gen. Laws § 7–12–34(a). "A continuation of the business by the partners . . . without any settlement or liquidation of the partnership affairs, is prima facie evidence of a continuation of the partnership." *Id.* § 7–12–34(b).

Mr. DeVona's primary argument is that since he worked with Dr. Zeitels on a medical instrument after Endocraft formed in 1999, there was a "continuation of the business by the partners." He portrays Endocraft as merely a sales arm carrying out the goals of a surviving "umbrella partnership." Appellant's Br. 38. This argument fails for two reasons.

First, there was no continuation of the original business. As discussed above, the business itself fundamentally changed in 1999 to a long-term undertaking involving the actual manufacture of the products. Endocraft was formed as the only vehicle for that new manufacturing-focused business. Mr. DeVona became an employee. He signed an employment agreement with Endocraft. Thus,

while the parties continued to work together in general on a medical instrument, the undisputed record confirms that "the business" itself had changed. Accordingly, no reasonable jury could have concluded there was a continuation of the original business after 1999.

Second, even if we were to accept that there was a "continuation of the business" such that Mr. DeVona made a prima facie showing the partnership continued, R.I. Gen. Laws § 7–12 –34(b), this showing is rebutted by the glaring absence of any objective indicia of partnership after Endocraft formed in 1999. Those indicia are discussed below.[1]

1

With regard to the first two indicia, there is no evidence Mr. DeVona actually shared in the "profits" and "losses" of the medical device business. J.A. 1110 (Jury Instructions). Courts have noted that the UPA "has placed specific emphasis on profit-sharing as a 'particularly probative indicium of partnership formation, and some courts have even held that the absence of profit sharing compels a finding that no partnership existed.'" *Acinapura v. Natalizia*, No. PC 1999-2007, 2003 WL 22048717, at *5 (R.I. Super. July 30, 2003) (quoting *Southex*, 279 F.3d at 101); *see also*

---

[1] There are few decisions analyzing when a "particular undertaking is continued" under Section 7–12–34(a). Likewise, the parties cite no binding case law for determining what constitutes "continuation of the business," or how that prima facie showing of partnership may be rebutted by evidence confirming there is no "continuation of the partnership." *See* R.I. Gen. Laws § 7–12–34(b). However, the parties' arguments assume that the continued existence of a partnership is measured by the same indicia that evidence its *formation*. In the absence of controlling case law to the contrary, we agree this is an appropriate tool for divining whether a partnership endures.

*McAleer v. Smith*, 57 F.3d 109, 115 (1st Cir. 1995) (holding no partnership existed between vessel's owner and operator because operator lacked any ownership interest in vessel, did not "share in the profits" from vessel operations, and had no control over vessel's itinerary). "State law normally presumes that partners share equally or at least proportionately in partnership losses." *Southex*, 279 F.3d at 99 (citing R.I. Gen. Laws §§ 7–12–26(a), 7–12–29(1) & (2)).

Mr. DeVona repeatedly conceded at trial that Endocraft was the only "vehicle" of their purported larger business. *See, e.g.*, J.A. 499. Yet there is no evidence in the record he received a profit disbursement from Endocraft. J.A. 500 ("Q. Did you or Dr. Zeitels ever receive any actual income from the partnership? A. . . . I never did."). Remarkably, over the dozen years that Endocraft remained in existence, the record shows Mr. DeVona never discussed a profit disbursement with Dr. Zeitels—even after the company became profitable in 2005. *See* J.A. 428–30; J.A. 499–500.

Likewise, there is no evidence of record that Mr. DeVona shared in any of the actual losses of Endocraft, including when it was not profitable for the first few years. Mr. DeVona contends that he "guaranteed the debt of the company," Appellant's Br. 39, but the record does not support this sweeping statement. The only record evidence that Mr. DeVona potentially served as a guarantor in any capacity was a single credit card he guaranteed with Dr. Zeitels for the company. J.A. 371–72, J.A. 1205. However, there is no evidence that when Endocraft was losing money in the early years, Mr. DeVona paid anything toward the credit card (or any other debt). Instead, Dr. Zeitels shouldered all the actual losses of Endocraft. *See* J.A. 429.

Moreover, there is a complete lack of evidence that partnership profits/losses were ever tracked or recorded. As Mr. DeVona conceded, there were no books for the umbrella partnership. J.A. 499. There was no accounting

firm. *Id.* There were no monthly reports. *Id.* There were no annual reports. *Id.* As Mr. DeVona put it, any financial reporting or accounting regarding the medical business "was all about Endocraft, LLC, the vehicle for our partnership." *Id.*

Thus, there is no meaningful evidence of profit or loss sharing. The first two indicia therefore clearly cut against the existence of a partnership.

2

We turn next to financial and labor contributions. The record is plain that Dr. Zeitels was the sole source of financial support for the business when Endocraft formed. *See* J.A. 428 ("Q. And [Endocraft] was his company? A. Sure. Q. He put the money into it, correct? A. Yes, he did."); J.A. 429 ("Before there were any sales, he paid me out of Endocraft, which he put the money into.").

The record is equally clear that while Mr. DeVona contributed significant labor to the medical business operating as Endocraft, he did so as a paid employee. The ISRA he signed ensured that he was compensated with a commission of 40% of profits from net sales. J.A. 1193 (¶ 6(a)).

Mr. DeVona contends he was compensated outside the terms of the agreement until 2011. He infers that he was therefore being compensated as a partner. But as Mr. DeVona testified, whether officially labeled as a "salary," "it was pay for work." J.A. 429. His testimony on this point is clear and uncontradicted. The facts cannot support the inference that Mr. DeVona presses for here. The record evidence only supports the conclusion that he was being paid as an employee of Endocraft for his contributions, albeit at times outside the strict parameters set out in the ISRA.

Indeed, beginning in 2002 and continuing after Endocraft became profitable in 2005, Dr. Zeitels paid Mr. DeVona an annual salary. J.A. 349; J.A. 428–30; *see also* J.A. 430 ("Q. So we had advances before there were any

sales. Then you got paid when there were sales even before there was a profit?[;] A. Yes, out of Endocraft income."). It is undisputed that over the course of Endocraft's operation, Mr. DeVona received up to $850,000 in compensation for his work. J.A. 489. This figure represents about half of Endocraft's net sales ($1.72 million), after appropriate deductions. J.A. 1006.

Given these undisputed facts, there is no reasonable basis for inferring Mr. DeVona was anything other than an employee whose payment was meant to be commensurate with the sales of the company. Therefore, the evidence of the parties' respective financial/labor contributions indicates no partnership existed after Endocraft formed.

3

The indicia regarding control over assets further confirms that there was no continued partnership. It is undisputed that Endocraft was owned entirely by Dr. Zeitels. J.A. 1187 (listing Dr. Zeitels as the "President" and "sole member" representing all ownership interest in Endocraft). On the application for a line of credit regarding the business, Dr. Zeitels was listed as owning 100% of Endocraft, while Mr. DeVona's ownership stake was listed as 0%. J.A. 1205. This point was punctuated by the ISRA, which stated that Mr. DeVona was not a "partner" in Endocraft. J.A. 1196 (¶ 12).

In Mr. DeVona's view, Dr. Zeitels total ownership of Endocraft is inconsequential to the question of partnership. As previously discussed, Mr. DeVona insists that Endocraft was merely the manufacturing arm of some greater business. Appellant Br. 37–38. But the trial record provides no support for that statement. The evidence is consistent that Endocraft was the *only* manifestation of the medical device manufacturing business between Mr. DeVona and Dr. Zeitels. Indeed, neither at trial, nor in post-trial briefing, nor on appeal now does Mr. DeVona point to any other relevant company, venture, or vehicle for

the business.  In short, Endocraft was the business.  Dr. Zeitels was sole owner of that business.

There is simply no evidence under this indicia that a partnership existed after 1999.

4

Turning to the next indicia, the record was plain that Dr. Zeitels had exclusive control over the ultimate management decisions at Endocraft.  Despite the managerial decisions Mr. DeVona oversaw as an employee wearing many hats, the written record confirms that Mr. DeVona himself repeatedly acknowledged Dr. Zeitels's final control of business decisions.  As Endocraft was the sole vehicle for the business, Dr. Zeitels thus exercised control over the entire business.

In a 2003 email, Mr. DeVona admitted: "Our deal at Endocraft and your position as absolute head of the company as [its] creative/seminal/driving force person is unequivocal for me."  J.A. 1243; J.A. 541.  On December 6, 2007, Mr. DeVona admitted to Dr. Zeitels, "I tend to be really persistent about some things when I feel I'm right.  But as [my wife] reminded me with an intellectual slap to the back of the head, it's your company . . . ."  J.A. 1244; J.A. 539.

The ISRA further cements that Dr. Zeitels exercised exclusive control over the highest order decisions.  Mr. DeVona's role in the business decisions was cabined by the ISRA to that of a manager-level employee.  This lack of shared authority is contrary to the rights enjoyed by partners under Rhode Island law.  Under the ISRA:

- Dr. Zeitels retained authority as owner to determine the material aspects of the business.  *See, e.g.*, J.A. 1192–96 (¶¶ 2, 5(a), 6(a), 6(d), 7, 8(b), 8(c), 11); *see also* J.A. 1243.  If Mr. DeVona was a partner, he would presumptively have "equal rights in the

management and conduct of the partnership business." R.I. Gen. Laws § 7–12–29(5).

- Similarly, under the ISRA, Mr. DeVona could "make no warranties or representations with respect to the products," and neither party had "any authority to bind the other in any respect." J.A. 1195 (¶ 10); J.A. 1196 (¶ 12). But a partnership is bound by the statements of its partners. *See* R.I. Gen. Laws §§ 7–12–20, 7–12–22.

- Finally, the ISRA was "at will." Dr. Zeitels could terminate Mr. DeVona from the alleged partnership's only business venture at "any time" in his "sole discretion with or without cause." J.A. 1193 (¶ 5(a)); *see also* J.A. 1209.

In sum, the ISRA confirms that Mr. DeVona was an employee, had no ownership in Endocraft, and was subject to termination at any time. Mr. DeVona's acceptance of the ISRA cannot be reconciled with his claim that a partnership existed.

In an attempt to do so, Mr. DeVona argues that his May 18, 1999, letter to Dr. Zeitels evidences his fears about the ISRA and his need for assurance the partnership would continue. In particular, Mr. DeVona points to his statement that the ISRA "is just an inaccurate representation of what I've been doing for the last year to earn my 40%." J.A. 1173; *see also* J.A. 970. Mr. DeVona seeks the inference that by referencing 40% here, he was asserting to Dr. Zeitels that he is entitled to a 40% share of *the company* on top of his 40% sales income under the ISRA.

This inference is unsupported. Mr. DeVona's letter makes no reference to a share of Endocraft. Instead, it only involves a detailed discussion of the "risks" and "benefits" he believes justify his reward—40% of net sales from the instruments. *See* J.A. 1174–77. The letter goes on to explain why he wanted to document the reasons justifying his

high sales commission. J.A. 1174 ("If it misleadingly de-fines what I've done . . . in exchange for such a high per-centage of a commission, my earnings might be misconstrued legally as an unearned and indefensible gift and not a subcontract."). These statements about his sales commission do not evidence a share in an umbrella part-nership.

Mr. DeVona also points to portions of the letter in which he spelled out a laundry list of reasons why he felt inadequately protected under the ISRA. These concerns, however, only underscore the absence of an existing um-brella partnership. Mr. DeVona wrote, "My downside has no coverage, no patent share if it is sold later, no share in the company, no exclusive rights or licensing share in this agreement." J.A. 1176. "You could . . . hypothetically give me notice and replace me immediately once all my work is done." *Id.*

As Mr. DeVona's statements confirm, his involvement in the business could end at any time and if the company was sold he would take no share of the proceeds. A partner would not encounter such issues. Had there been an en-during umbrella partnership above Endocraft, such protec-tions would already exist. For example, Mr. DeVona's concern that he had "no share in the company" would be irrelevant if an umbrella partnership existed since he would still be entitled to his 40% share of the partnership. Nowhere in the letter does Mr. DeVona assert he has such rights.

To further explain his decision to sign the ISRA, Mr. DeVona points to his testimony that Dr. Zeitels assured him their "underlying agreement that we were partners" would remain unchanged and the "umbrella of the partner-ship is still there." J.A. 333; J.A. 340. After fully crediting this testimony, J.A. 10, the district court concluded that the evidence of "the subsequent conduct of the parties" points "so strongly and overwhelmingly in favor of Zeitels that no

reasonable jury could have found a continuing partnership after May 1999." *Id.* We agree.

Aside from this piece of testimony from Mr. DeVona and a vague statement from his friend, Steve Fusco, *see supra* 21, there is a remarkable lack of any real indicia of partnership under Rhode Island law in the twelve years that followed Mr. DeVona's decision to execute the ISRA. In light of this record, this threadbare testimony about what Dr. Zeitels said before Mr. DeVona signed the ISRA cannot support the conclusion that the partnership continued.

In Mr. DeVona's view, such testimony alone can suffice to sustain a verdict. But Mr. DeVona's reliance on *Gabrielle v. Marini*, 80 R.I. 458 (1953), is misplaced. In *Gabrielle*, the plaintiff testified to the existence of a partnership for a restaurant. But there was simply no counterevidence. *Id.* at 463 ("[T]he evidence of that fact . . . appears to be undisputed."). Not only did the defendant in *Gabrielle* decline to offer any testimony, but there was also no mention of any other counter evidence, such as written records. *See id.* In concluding there was no clear error in finding a partnership, *Gabrielle* emphasized that "the evidence is uncontradicted" that "funds contributed by both parties were employed in the common enterprise with the express understanding that the profits thereof were to be shared equally." *Id.* Based on the record evidence, it was also undisputed that the parties were both on the hook for any losses. *Id.* ("While nothing was said about losses in excess of the capital invested there can be no question that they too would have to be shared.").

Here, there is extensive written evidence and additional testimony from Mr. DeVona himself—who agreed no partnership records were kept or profits/losses shared—that directly contradicts the existence of a true partnership. Moreover, as to the issue at hand, there is no dispute

that Dr. Zeitels exercised ultimate control over Endocraft decisions.

Thus, in light of the ISRA and the surrounding record evidence, there is no record of shared management.

### 5

Finally, we address the remaining indicia, including tax returns, partnership name, and representations to third parties. Courts applying Rhode Island law have concluded that no partnership exists where, inter alia, the parties "did not file partnership taxes" and did not "operate under a shared name." *T.G. Plastics Trading Co. Inc. v. Toray Plastics (Am.), Inc.*, 958 F. Supp. 2d 315, 328 (D.R.I. 2013).

Mr. DeVona does not dispute that the purported partnership never filed a single tax return. Nor did it issue a form K-1. J.A. 497–99. Rather, each year Dr. Zeitels appears to have reported all of Endocraft's income on his personal taxes and paid its income tax. *See* J.A. 661; J.A. 683.

Likewise, Mr. DeVona further concedes that there is no evidence a partnership conducted any business in its own name after Endocraft formed. There are no invoices, bills, bank statements, letters, internal memos, or records of any kind.

Ignoring the empty record, Mr. DeVona contends the district court's decision is flawed because it did not address how Mr. DeVona and Dr. Zeitels "held themselves out to third parties." J.A. 1110–11; *Southex*, 279 F.3d at 99, 101–103. Mr. DeVona relies on a handful of communications in which he and Dr. Zeitels were referred to as partners in passing. For example, prior to the meeting in April 1999, ACT Medical employees sent a fax to Dr. Zeitels's attorney indicating that they were "look[ing] forward to meeting with Dr. Zeitels & his partner." J.A. 965; J.A. 1160. According to Mr. DeVona, Dr. Zeitels introduced him as his partner at the meeting with ACT Medical. J.A. 330.

Finally, Mr. DeVona's friend, Mr. Fusco, testified that he once overheard Dr. Zeitels tell Mr. DeVona that they "were partners" and "when we sell the company, you're going to get a check for like a million dollars" during a conversation at a space he shared with Mr. DeVona in Providence some time "in the late '90s, early 2000, in that range." J.A. 595; J.A. 602–603.

This evidence fails to confirm that a partnership existed for several reasons. First, most (if not all) of these statements occurred before the parties switched gears and formed Endocraft in May 1999.

Second, "[i]t is well settled that the use of the word 'partner' in the colloquial sense is insufficient as a matter of law to establish a legal partnership." *CDS, Inc. v. Karndean Int'l, LLC*, No. CV 15-148M, 2017 WL 1379603, at *10 (D.R.I. Mar. 17, 2017), report and recommendation adopted, No. 15-CV-148-M-PAS, 2017 WL 1383672 (D.R.I. Apr. 14, 2017); *see also T.G. Plastics*, 958 F. Supp. 2d at 327–28 ("[T]he use of the word 'partner' or 'partnership' colloquially in emails by executives of either company does little to establish that a legal partnership existed.").

Third, for a partnership that purportedly lasted for a dozen years after the formation of Endocraft, Mr. DeVona musters a handful of instances in which the parties are described as "partners" in some sense. Otherwise, the record of written emails to vendors, purchasers, and even between the parties themselves over the years is completely devoid of any official mention of Mr. DeVona as a partner. Without more, a few references to Mr. DeVona as a partner or colleague cannot fill the void of more than a decade of silence with no records or other indicia from the activities of a genuine partnership operating above Endocraft.

For the reasons above, the district court did not err in concluding that no reasonable jury could conclude a partnership continued after the formation of Endocraft in 1999.

## B

Mr. DeVona next argues that the district court improperly excluded a 2011 email. In the email, Mr. DeVona wrote to his attorney to discuss the purported partnership after Endocraft was sold. According to Mr. DeVona, this evidence was admissible because "[w]hen a witness, on the stand and under oath, acknowledges that a prior statement is his own statement and is truthful, then the witness adopts the prior statement as his present testimony and there is no hearsay problem." *Amarin Plastics, Inc. v. Md. Cup Corp.*, 946 F.2d 147, 153 (1st Cir. 1991).

Mr. DeVona's argument is unpersuasive for two reasons. First, Mr. DeVona failed to raise this exclusion to hearsay as a basis for admitting the evidence at trial. *See* J.A. 377 (arguing only that the exhibit was admissible under the business records exception). As such, this argument was waived. *See Boggs v. West*, 188 F.3d 1335, 1337–38 (Fed. Cir. 1999). Second, there is a lack of foundation for this exclusion. Mr. DeVona never testified that his statements in the 2011 email were truthful, *see* J.A. 376–78, which courts universally recognize is required to trigger this exclusion. *See Amarin*, 946 F.2d at 153 (collecting cases); *see also* Fed. R. Evid. 801 advisory committee's note (d)(1) (if declarant "admits on the stand that he made the statement and that it was true," there is no hearsay problem).

## C

Finally, Mr. DeVona argues that the district court abused its discretion by conditionally granting a new trial. We review the grant of a new trial for abuse of discretion. *Latin Am. Music Co. v. Media Power Grp., Inc.*, 705 F.3d 34, 40 (1st Cir. 2013). "A trial court may grant a new trial on the basis that the verdict is against the weight of the evidence," as well as "whenever, in its judgment, the action is required in order to prevent injustice." *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009). In contrast to

JMOL, the district court may independently weigh the evidence when considering a motion for a new trial, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1310 (Fed. Cir. 2011) (applying First Circuit law), and "may consider . . . the credibility of the witnesses," *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 104 (1st Cir. 2006).

Based on the clear lack of evidence of a partnership, the district court did not abuse its discretion in concluding the jury's conclusion was against the weight of the evidence.

## CONCLUSION

For the foregoing reasons, we affirm the district court's decision granting judgment as a matter of law, excluding certain evidence, and conditionally granting a new trial.

**AFFIRMED**

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**DENNIS R. DEVONA,**
*Plaintiff/Counterclaim Defendant-Appellant*

**v.**

**STEVEN M. ZEITELS,**
*Defendant/Counterclaimant-Appellee*

**ENDOCRAFT LLC,**
*Counterclaimant-Appellee*

———————————

2018-1210

———————————

Appeal from the United States District Court for the District of Massachusetts in No. 1:13-cv-10952-IT, Judge Indira Talwani.

———————————

CLEVENGER, *Circuit Judge*, dissenting.

Dennis DeVona and Stephen Zeitels once were close friends, so much so that DeVona officiated at the Zeitels' wedding. DeVona is a skilled designer, tool maker and manufacturer. Zeitels is a throat surgeon. The two bonded over a shared passion for antiques. Zeitels came up with the idea for an improved glottiscope, a device used by throat surgeons to access the larynx during surgery. Zeitels convinced DeVona to assist in development of the

new product. DeVona gave up his previous employment and worked full-time on developing the new device. Zeitels provided all the money to fund the project. When the two realized that it would be quite expensive to outsource production of the new device, Zeitels created a new, wholly owned, corporation to develop and sell the new device. Zeitels determined that DeVona should become an independent sales representative under contract with the corporation. Zeitels also made DeVona vice president of the corporation. The business in time became profitable. In October of 2011, Zeitels informed DeVona that he was closing the corporation and taking its assets. From the start of the undertaking until it was shut down in 2011, Zeitels maintained his medical practice full time, and DeVona devoted himself full time to running the business.

DeVona sued Zeitels in the U.S. District Court in Massachusetts, claiming that he and Zeitels had formed a partnership in 1997, that Zeitels had wrongfully terminated the partnership in 2011, and that Zeitels owed him damages for the wrongful termination.

At trial, the jury was presented with two strikingly different characterizations of the relationship between Zeitels and DeVona. Zeitels, throughout the trial, adamantly insisted that he never agreed to be DeVona's partner. At most, DeVona would have been an employee, but never a partner. DeVona's understanding was entirely different.

DeVona told the jury that, at the very beginning, he insisted to Zeitels that he would only become involved in the project as a full equity partner. DeVona told the jury that he met in Boston with Zeitels, and both agreed to be partners, with the terms of the partnership being "[w]e would split 60/40. He would put up the money. I would put up the energy and work it would take. And we'd try and knock it out in 12 months . . . I should do the work, and we were going to go forward with a business. Whatever we developed we'd sell and, hopefully, quick." J.A. 245. A third

party told the jury that he had overheard Zeitels telling DeVona that they "were partners," and that in the end DeVona "would get a check for like a million dollars." J.A. 595.

DeVona testified about how his efforts resulted in the first prototype of the new device, how he and Zeitels came to learn that outsourcing manufacture of the device would be too expensive, and how, as a result, the two "switched gears" in 1999 to proceed in-house. J.A. 414. Zeitels created the corporation to shield himself from any liability that might arise from manufacture of the new device, and insisted on formalization of DeVona's relationship with the corporation. DeVona testified that Zeitels told him that the independent sales representative agreement "did not change the underlying relationship. The umbrella partnership is still there and that whenever we make and sell this stuff is going to be – that's when we were going to end it…[W]hen we sell the company." Trial Tr. 2-129:13-16. When asked if he and Zeitels discussed whether the new corporation affected their relationship, DeVona testified that Zeitels assured him that the corporation did not change the underlying agreement that they were partners, saying "it doesn't change a single thing." J.A. 333.

By the close of evidence, the jury heard two utterly different stories about the relationship of DeVona and Zeitels in the ongoing effort to create and sell a business built around a new medical device. As the trial proceeded, each side sought to undermine the other's credibility. Since there was no written evidence to show the existence of a partnership, the jury was left with only the testimony of the two men, and a few tidbits of possible partnership indicia, such as the joint bank account holding Zeitels' money. To be sure, beyond the testimony of the two men about their relationship, the evidence was thin on the traditional indicia of partnership. If the jury could find a partnership here, it would have to credit DeVona's testimony over Zeitels'.

In a case such as this where there is no intrinsic evidence of a partnership agreement, a partnership would depend on extrinsic evidence, and under Rhode Island law, the existence of an extrinsic evidence-based partnership is a question of fact, not a question of law. *See T.G. Plastics Trading Co. v. Toray Plastics (Am.), Inc.*, 958 F. Supp. 2d 315, 327 (D.R.I. 2013) (stating that "when a party has extrinsic evidence supporting the existence of a partnership, . . . whether the partnership actually exists" is a question of fact); *Cheetham v. Cheetham*, No. C.A. 71–575, 1979 WL 196028, at *9 (R.I. Super. Ct. July 16, 1979) ("The existence of a partnership relation is a question of intention to be gathered from all of the facts and circumstances revealed by the evidence."); *Acinapura v. Natalizia*, No. PC 1999-2007, 2003 WL 22048717, at *4 (R.I. Super. July 30, 2003) (discussing that, in partnership cases, "the parties' intent should be ascertained as a question of fact").

Before the jury retired, Zeitels filed a Rule 50(a) motion for judgment as a matter of law on three grounds. First, regarding whether there was a partnership of any kind at all, the motion insisted that there were insufficient facts to show any partnership under the governing Rhode Island law. Second, if there was a partnership for a particular undertaking (creating and selling a business), the undertaking was "frustrated or prevented by the mediocre work by Mr. DeVona and his failure to make [the corporation], the sole asset, viable or marketable to a buyer. That frustration of purpose excuse[d] Dr. Zeitels from liability for withdrawing from the alleged partnership." D. Mass. Dkt. No. 263 at 19. Third, if a partnership existed, it was one at will, which could be dissolved by either party at any time for any reason. The record at trial supplied a basis for the first ground for the Rule 50(a) motion, because the parties plainly disputed whether they entered a partnership. The record, however, did not support either of the other grounds, because the jury never heard any evidence to support a distinction between types of partnership, and no jury

charge was given on that subject. The district court denied the Rule 50(a) motion and the case went to the jury.

The jury returned a verdict for DeVona giving him all he asked for on his breach of partnership claim. To do so, the jury had to conclude that a partnership existed until Zeitels destroyed the partnership by closing the business. To reach that conclusion, the jury had to believe DeVona over Zeitels, which included believing DeVona's testimony that the shift in gears had no effect on the partnership.

Zeitels then filed a renewed motion for judgment as a matter of law pursuant to Rule 50(b). Because the law prevents a Rule 50(b) motion on any ground not raised in the Rule 50(a) motion, *Cornwell Entm't, Inc. v. Anchin, Block & Anchin, LLP*, 830 F.3d 18, 28 (1st Cir. 2016), Zeitels' Rule 50(b) motion only repeated the grounds for the Rule 50(a) motion: There was insufficient evidence for the jury to find any partnership, but if a partnership for a particular undertaking existed, it was breached by actions of DeVona, or, alternatively, if a partnership at will existed, Zeitels was free to dissolve it. Zeitels' memorandum in support of the Rule 50(b) motion, however, raised a new ground for upsetting the jury verdict. The memorandum argued that the switching of gears in 1999 to bring the project in-house changed the particular undertaking, and thereby dissolved the original partnership and converted it to a partnership at will which Zeitels was free to dissolve.

The district court granted the Rule 50(b) motion. The district court held that the jury was free to find a partnership for a particular undertaking to "create a company or a surgical device and to sell that device or company, or the intellectual property associated therewith, to the highest bidder in the shortest amount of time possible." J.A. 7. The district court next posited that under Rhode Island law, a partnership for a particular undertaking dissolves by the termination of the particular undertaking. Next, although in agreement that the evidence supported a partnership for

a particular undertaking at the start, the district court, without citing any testimony, held, as a matter of fact, that any such partnership dissolved when the partners agreed in 1999 to switch gears by taking the project in-house.

The district court then addressed the evidence described above directed to the switching of gears to take the business in-house, namely that the switching of gears had no effect on the partnership. The district court purported to "accord those statements full weight." J.A. 10. But, instead of crediting that evidence to show that the switch in gears had ***not*** dissolved the partnership (which is of course the only purpose for which the testimony was given, and the only reason for which it could be given weight), the district court instead characterized that evidence as having been offered by DeVona to show a continuing partnership ***after*** the purported dissolution of the partnership as a result of the gear change. As such, the district court held that DeVona's evidence did not support a continued partnership after the putative dissolution.

Without question, the district court committed plain error twice. First, the district court *sua sponte* dissolved the admitted partnership for a particular purpose, due to the shift in gears, even though the only testimony on the subject was that the change in gears was of no consequence. Second, and related, the district court gave full weight to DeVona's testimony for the wrong reason. Instead of giving weight to the proposition that the switch in gears did not affect the underlying partnership, and therefore that the original partnership for a particular undertaking survived the gear switch, the district court turned the very same evidence against DeVona, by saying it was insufficient to show a new partnership after the court personally dissolved the original partnership.

If the original partnership was not dissolved, there is no reason to ask if the indicia after 1999 (which essentially did not change: Zeitels put up all the money and DeVona

did all the work) would support a new partnership. The new partnership notion is a red herring, a made-up ground to deny DeVona his constitutional right to a fair jury trial. If the district court (and the majority here) gave full weight to the testimony in DeVona's favor, there is no basis to bar the jury from finding that the switch in gears had no effect on the partnership. *See Crowe v. Bolduc,* 334 F.3d 124, 134 (1st Cir. 2003) (noting that, when considering a motion for judgment as a matter of law, district courts are required to weight their review "toward preservation of the jury verdict").

In this credibility contest between the word of DeVona on the one hand, and Zeitels on the other, the only question of relevance is whether DeVona's testimony that the change in gears had no effect on the underlying partnership was properly credited by the district court in deciding the Rule 50(b) motion. Because my respected colleagues in the majority endorse the plain error committed by the district court, I must dissent. DeVona is wrongly deprived of his jury verdict.